Filed 12/1/15

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| THE PEOPLE, | C076260 |
| Plaintiff and Respondent, | (Super. Ct. No. CR3239) |
| v. | |
| KENFORT ROBIN WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Calaveras County, Thomas A. Smith, Judge. Affirmed.

Carlo Andreani for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Kenfort Robin Williams appeals from the trial court's order extending his commitment to a state hospital under Penal Code section 1026.5, subdivision (b)(1).[1] Defendant contends there is no substantial evidence (1) that he has serious difficulty in controlling his behavior, (2) that he has a mental disease, defect, or disorder, and (3) that his mental disease, defect, or disorder creates a substantial danger of physical harm to others. We affirm.

FACTS

*Background*

In early 1993, defendant, then 51 years old, was arrested for possession of methamphetamine; he was also found in possession of drug paraphernalia and a loaded firearm.

While on bail in June 1993, defendant fired a machine gun and injured a police officer, and the next day shot at an officer and a police dog. A jury found him not guilty by reason of insanity (NGI) of two counts of attempted murder (§§ 664/187), two counts of assault on a custodial officer with great bodily injury (§ 245, subd. (b)(3)), unlawful possession of a machine gun (former § 12220), and interfering with a dog being used by a police officer (§ 600).

Defendant's adult criminal record also included molestation of his 10-year-old stepdaughter, three convictions for driving under the influence of alcohol or drugs, and carrying a concealed weapon. He had no juvenile criminal record.

Two mental health professionals evaluated defendant in 1993. Both noted that defendant seemed angry and paranoid toward the police department and the justice system, likely due to abuse of methamphetamine and alcohol. One evaluator also opined: "[Defendant] is extremely rigid, and as long as his views of circumstances of the world is

---

[1] Undesignated statutory references are to the Penal Code.

[*sic*] listened to, he is calm and cooperative. However, any attempt to confront that rapidly leads to escalation and probably to explosive behavior . . . and beliefs that he has a right to live his life and behave as he sees fit. This is not only the basis of his delusional disorder, but I think also on the basis of his paranoid personality."

On July 11, 1994, defendant was committed to a state mental hospital. (§ 1026.) His maximum commitment date was April 5, 2014.

Defendant was admitted to Atascadero State Hospital in June 2009 after being transferred from Napa State Hospital, from which he had attempted to escape. When admitted, defendant claimed he had no motivation to be psychiatrically stable, to take medication, to avoid harming himself or others, or to avoid illicit drugs. Thereafter, he persistently refused to attend therapeutic groups in the hospital.

From January 2010 through December 2012, progress reports signed by Atascadero State Hospital Staff Psychiatrist Joshua Deane, M.D., and sometimes also by Senior Psychiatrist Supervisor/Forensic Services Director David Fennell, M.D., stated that defendant was a danger to others due to a mental disease, defect, or disorder. He was consistently diagnosed under the Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV) with alcohol and amphetamine dependence and personality disorder NOS (not otherwise specified).

According to the earliest report, defendant's thought content was "devoid of overt delusions, hallucinations, and homicidal/suicidal ideation"; however, "insight and judgment are impaired." His current offense was "fueled by his concurrent use of methamphetamine," but also by his "persecutory delusions against police officers, rigid personality structure, and impaired insight/judgment." He remained "defiant and oppositional." His "deeply-rooted personality disorder" was the most likely cause of his "ongoing difficulties." He denied mental illness, attributing his current offense entirely to methamphetamine use but refused to participate in substance abuse recovery treatment, and had no relapse prevention plan. Although he had not been violent in the past 12

3

months, his outstanding personality difficulties, combined with a relapse into alcohol and drug use, could "easily push him over the edge and lead him to act out violently with lethal consequences." Defendant said he planned to "wait here for another five years until my commitment expires."

The reports filed through the end of 2012 all made the same assessment. They noted that although defendant's paranoia, disdain for others, and adult criminal history showing a disregard for others' rights might have been consistent with antisocial personality disorder (APD), defendant had no history of conduct disorder before the age of 15, a prerequisite for the APD diagnosis. He initially attended few assigned group sessions, and even after his overall attendance record and attitude improved, he still refused to attend substance abuse recovery treatment groups or to show any evidence of a relapse prevention plan. As stated in a May 2012 report, when asked why he did not attend group treatment, defendant "indignantly" said: "I have 23 months to go to court. I am not going to CONREP [conditional release program]. I don't have a mental illness. Why do I need to go to group?" Late in 2012, defendant and a social worker discussed his frustration at being confined for 17 years; the social worker encouraged him to participate more in his treatment and work within the hospital and legal system, to demonstrate he was safe for discharge.

However, the last two reports filed before defendant's commitment proceedings, signed by Dr. Fennell but *not* by Dr. Deane, disagreed with the prior reports.

In July 2013, Dr. Fennell stated: "It is my opinion to a reasonable degree of medical certainty that [defendant] does not have a mental defect, disease, or disorder. He therefore does not by reason of a mental defect, disease or disorder represent a danger to the health and safety of others. The recommendation is to retain until expiration of present commitment." Dr. Fennell did not change defendant's DSM diagnosis, but opined that voluntary intoxication, without which defendant would not have committed

4

his commitment offenses, did not qualify as a mental defect, disease, or disorder under section 1026.**2**

Dr. Fennell noted that defendant now attended 75 to 85 percent of his group sessions and conducted himself appropriately with staff and peers. He had satisfactorily completed substance abuse treatment, had recognized the importance of substance abuse as a trigger to his criminal conduct and a danger to his mental health, had expressed willingness to seek treatment in the community on release (though he had never done a 12-step plan and did not like such plans), and had been urged to update his relapse prevention plan. Without substance abuse, defendant's danger to others was low.

In August 2013, Dr. Fennell recommended defendant's discharge at the end of his current commitment. Defendant had recently taken steps to update his relapse prevention plan and was open to seeking a sponsor and individual treatment in the community. Dr. Fennell acknowledged, however, that defendant had "a very limited support system" and had broken off contact with his son.

*The Commitment Proceedings*

On November 27, 2013, the Calaveras County District Attorney filed a petition to extend defendant's commitment, attaching the above reports as exhibits.

Before trial, the People offered defendant a CONREP conditional release with a two-year term. Defendant rejected the offer.

In January 2014, the trial court received a letter by S. Jackson, M.D., defendant's treating psychiatrist at Atascadero State Hospital since February 2012, who strenuously urged defendant's release. Dr. Jackson stated that defendant had "never during his hospitalization exhibited any psychiatric symptoms" and had "never required

---

**2** Dr. Fennell did not discuss personality disorder NOS in this context. However, as we explain below, he opined at defendant's hearing on extension of commitment that this condition also does not qualify under section 1026.

5

psychotropic medication." He had "no psychiatric diagnosis with the exception of alcohol abuse, amphetamine dependence, and a non-specific personality disorder." He had received treatment for the substance abuse that led to his commitment offense. He "require[d] no treatment for his personality disorder." He understood that his "rigidity and stubbornness" had caused him difficulty, but did not want to change. He was "quite capable of interacting with others and of taking care of himself." He had never been violent or threatening during his hospitalization. He was always courteous and polite to those who treated him with respect. He was not a danger to the community. In Dr. Jackson's opinion, continued hospitalization of defendant was unnecessary, would not benefit defendant or the community, and was "a waste of precious resources."

Defendant waived jury trial. At bench trial, the People called only Dr. Deane; defendant called only Dr. Fennell.

Dr. Deane testified as follows:

He had known defendant since 2010, largely in the capacity of a forensic reporter. He was not part of defendant's treatment team, but sometimes covered for members of the team in emergencies.

Defendant was currently attending three treatment groups: "house living," substance abuse recovery treatment, and "veteran's groups." He was not taking any psychiatric medications.

For a long time after being hospitalized, defendant was unwilling to attend group sessions. Recently, however, his participation had improved somewhat. This improvement followed a conversation "two or three months ago at most" in which, "given [that] the hearing is coming up, [defendant] agreed to attend substance abuse recovery treatment finally."

Aside from alcohol and methamphetamine dependence, defendant suffered from personality disorder not otherwise specified. He could not be diagnosed with antisocial personality disorder because he lacked a juvenile record. But his "rigid thinking, his

6

paranoia and the way he will hold a grudge to such an extent that it can be totally unreasonable . . . impaired his social occupational functioning" and constituted a personality disorder under DSM-IV.

In 2010, defendant told Dr. Deane that it angered him when an officer performing a traffic stop used defendant's cell phone without authorization, raising his phone bill and causing him to feel "there is no justice." It was "quite extraordinary" that defendant would shoot an officer just because the encounter was costing him money.

For the last four years, working with defendant had been "a stalemate, no progress whatever." Expecting automatic release when his maximum term expired, he did not avail himself of the opportunities the hospital provided. However, his "oppositional stance softened a great deal" as of December 2013, when he agreed to let staff help him enroll in substance abuse treatment.

In Dr. Deane's opinion, defendant was not a danger to others in a hospital setting, but if released without supervision, he would pose a "really significant" danger. His personality disorder had no specific treatment. He was still defiant toward staff he disliked, even to the point of refusing prescribed medication. His promise of future sobriety was hard to credit, given how long he had refused to attend his substance abuse treatment group and how recently he had started to do so. His refusal of treatment for prostate cancer suggested that he did not care about his life, which could make him "reckless and careless" if released. Although he was using methamphetamine at the time of his commitment offenses, his underlying motivation was "his grudge against a police officer, against a legal system and [he] firmly believed that he can do whatever he wants to do and he shot the deputy and in almost a cold-blooded manner"; in other words, his personality disorder was "a very, very important part of his crime" and could manifest again similarly. Finally, he had no realistic relapse plan: he had to register as a sex offender, his future living situation was unknown, he had cut off his relationship with his son, he would be in the community without support or supervision, it was hard to believe

7

he would use services such as AA meetings on the outside that he had refused in the hospital, and he had a terminal illness he did not want to treat.

Defendant's relapse plan looked like it was "done hastily at the last minute to make sort of an impression." Staying sober is a lifelong struggle, requiring a support system and constant vigilance. Normally, patients go through substance abuse recovery treatment in three stages, and only then do they formalize a written relapse plan. Defendant's sudden claim, just before this hearing, that he had a relapse plan and was attending treatment "doesn't come across as sincere or really heartfelt." His ability to abstain from alcohol and drugs in the hospital setting did not prove he could do so on his own.

Defendant insisted as recently as the Monday before the hearing that he would not consider a CONREP release. The likelihood that he would use CONREP's services was "very low." Without CONREP's support, there was no reason to feel positive that defendant could handle even the ordinary stresses of life.

Defendant's refusal to consider CONREP showed that he remained a "rigid, inflexible, obstinate individual with poor judgment . . . and insight about his circumstances" and that he had "really not fully come to grips or come to terms with his troubled past." This attitude "just speaks ill of his probability of successfully reintegrating into the community without any violence."

If defendant relapsed with drugs or alcohol, "he may very well feel that look, I am going go to [*sic*] down and the system has ruined my life, I am going to take someone down as well." Given his impaired judgment, his grudge against authority, his age, and his terminal illness, he might act irrationally and become physically violent.

Even though Dr. Fennell was Dr. Deane's "boss," Dr. Deane disagreed with Dr. Fennell's opinion in this case.

Dr. Deane discussed defendant's case with Dr. Jackson in detail "last Monday." He thought she now agreed with his position.

8

Dr. Deane had not known about Dr. Jackson's letter until she showed it to him. They went through it together line by line. He told her that some statements in the letter (e.g., that defendant had been courteous and cooperative at all times) were "flat-out inconsistent with . . . the clinical record." She said her statement that defendant had "no symptoms" meant that he did not show hallucination, depression, or mania; it did not rule out personality disorder. Dr. Deane explained that a personality disorder "meets the criteria within the meaning of a PC 1026.5"; she said she had not known that was "the issue." Her statement that defendant could safely be released into the community did not indicate whether she was thinking of CONREP release or unsupervised release.[3]

Defendant's treatment group, to which Dr. Jackson belonged, was very supportive of defendant and very sympathetic with his situation. Treatment teams commonly become frustrated by lack of progress or the sense that nothing else can be done for the patient, and this feeling could lead to the desire to "see him out"; for this reason, the team might arrange to get him through last-minute substance abuse recovery treatment and anything else needed to help him obtain his release.

In Dr. Deane's opinion, defendant currently suffered from a mental disease within the meaning of section 1026.5, as established by the relevant case law: personality disorder not otherwise specified. This mental disease meant that he had a serious difficulty in controlling his behavior and that he remained a danger to the health and safety of others.

Although a patient with personality disorder NOS could change his attitudes and behaviors sufficiently to obtain CONREP release, defendant had not done so; therefore,

---

[3] After this testimony, defense counsel presented the letter to Dr. Deane and asked him to authenticate it, then moved it into evidence as an exhibit. The trial court ruled it inadmissible hearsay without foundation because defendant had not shown that Dr. Deane relied on it in forming his opinion.

his likelihood of relapse into addiction was "so high, I can just not stress enough." Defendant's change of behavior in the last two months was not the kind of change required; it was merely an attempt to "at least appear agreeable," after having made an "ill-advised calculation" through most of his hospitalization to shun treatment in the expectation of automatic release when his term expired.

Dr. Fennell testified as follows:

Personality disorder NOS does not meet the criteria for a mental disease, defect, or disorder under section 1026.5. Under California case law, antisocial personality disorder constituted a qualifying mental disease, but defendant did not have that diagnosis, even though he had shown some antisocial behavior as an adult.[4]

Defendant could be dangerous to others if he relapsed into the use of methamphetamine and alcohol, but his dangerousness would not be "a product of a mental disease, defect or disorder" because it would stem from a choice to abuse substances, and voluntary intoxication did not qualify under section 1026.5. Since defendant did not have a mental disease, defect, or disorder, he did not pose a substantial danger of physical harm to others by reason of such mental disease, defect, or disorder. He did not have a serious difficulty in controlling his behavior. If he did not use methamphetamine or alcohol, he would be no more dangerous than the average person.

Dr. Fennell was not a member of defendant's treatment team, but met with the team in defendant's presence at some time during or after July 2013. It was the team's consensus that defendant did not have a mental disease, defect, or disorder under section

---

**4**      Though Dr. Fennell did not fully spell out his reasoning, it appears that he read the controlling case law to hold that the only kind of personality disorder that comes within section 1026.5 is antisocial personality disorder. As we shall explain, the trial court found that Dr. Fennell was incorrect on this point, and we agree with the trial court.

10

1026.5 and would not qualify for an extension of commitment. Since Dr. Fennell wrote his August 2013 report, he had not had "a sit-down session" with defendant.

Dr. Fennell did not coauthor the December 2012 progress report which recommended against defendant's release, but merely reviewed it and "administratively cosigned it" with Dr. Deane. As Dr. Fennell recalled, "it appeared that Dr. Deane's opinion was more that [defendant] had anti-social personality." After being shown the report, Dr. Fennell agreed that its diagnosis (personality disorder NOS) was actually the same as his own July 2013 diagnosis.

If Dr. Fennell were to learn that Dr. Jackson, with whom he had spoken before writing his reports, had changed her opinion, it would "definitely give me pause."

Dr. Fennell acknowledged that key traits of defendant's personality structure -- "oppositional, resistant to authority figures, very rigid, got some paranoid not delusions but just where he easily misinterprets the actions of others, takes offense easily, holds a grudge" -- could "becom[e] exacerbated with the use of methamphetamine."

Defendant's relapse plan was based on his having worked through substance abuse recovery and now being in the maintenance phase of treatment. Defendant disagreed philosophically with 12-step plans and said he would "pursue alternatives to substance abuse to maintain sobriety," such as "the insight he has gained from his years of treatment," which would teach him to stay away from persons and establishments where he might come into contact with alcohol or methamphetamine. Dr. Fennell would prefer defendant to be in a 12-step program and to have a sponsor, but "this is what he has offered as a plan." Dr. Fennell could not say "to a degree of certainty" that defendant's plan would keep him from relapsing.

After hearing argument, the trial court found beyond a reasonable doubt that defendant had the diagnoses of alcohol dependence, methamphetamine dependence, and personality disorder NOS. The court also found the evidence clear that defendant would be dangerous if released from the institutional setting. He remained defiant toward some

11

staff; he refused to take medications; his recent participation in substance abuse treatment was merely "going through the motions"; his relapse prevention plan was "not much of a plan" and had a great risk of failure; and his refusal to consider CONREP showed that he "want[ed] to call the shots without seeking any additional treatment." However, the court needed to research whether personality disorder NOS was a qualifying mental disease, defect, or disorder under section 1026.5.

The trial court thereafter entered its written ruling as follows:

"Citing the 'Blakely' decision [[s]ee *People v. Superior Court* (*Blakely*) (1997) 60 C[al.]A[pp.]4th 202] [(*Blakely*)], defense witness David K. Fennell, M.D.[,] testified defendant did not meet the first prong of . . . section 1026.5, i.e.[,] that defendant suffers from a mental disease, defect, or disorder, and recommended defendant be released from Atascadero State Hospital at the end of his current term. Dr. Fennell opined defendant's DSM IV--Axis II diagnosis of 'personality disorder, not otherwise specified' as a matter of law did not qualify as a mental disease, defect, or disorder. Dr. Fennell further opined that had defendant been diagnosed with 'antisocial personality disorder,' then as a matter of law defendant would be suffering from a mental disease, defect, or disorder. Dr. Fennell's interpretation of *Blakely, supra*, is misplaced.

"In *Blakely, supra*, 60 C[al.]A[pp.]4th 202, the appellate court held the trial court erred in holding that an antisocial personality disorder, as a matter of law, did not amount to a mental disease, defect, or disorder within the meaning of . . . section 1026.5(b). The court held, 'Accordingly, the issue of whether Blakely suffers from a mental disease, disorder or defect which renders him a danger to others (section 1026.5, subd. (b)(1)) is not a question of law, but rather one for the trier of fact to be resolved with the assistance of expert testimony. (section 1026.5, subd. (b)(7); *People v. Superior Court* (*Williams*), 233 C[al.]A[pp.]3d at pp[.] 489-491.)['] *Id.* at p. 213.

"The court finds the testimony of prosecution witness Joshua Deane, M.D.[,] to be credible. Based on his expert testimony, the court finds beyond a reasonable doubt that

defendant . . . suffers from a mental disease, defect, or disorder and, as a result of his mental disease, defect or disorder, he now poses a substantial danger of physical harm to others and he has serious difficulty in controlling his dangerous behavior.

"The court grants the People's petition for extension of commitment pursuant to . . . section 1026.5(b) of defendant . . . for a term of two (2) years ending April 5, 2016."

DISCUSSION

Defendant contends no substantial evidence supports the trial court's findings that he suffers from a mental disease, defect, or disorder within the meaning of section 1026.5, that by reason of such condition he represents a substantial danger of physical harm to others, and that he has serious difficulty in controlling his potentially dangerous behavior. We disagree.

Under section 1026.5, subdivision (b)(1), "[a] person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." The last element also requires proof that the person has serious difficulty controlling his dangerous behavior. (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159 (*Zapisek*); *People v. Bowers* (2006) 145 Cal.App.4th 870, 878 (*Bowers*); *People v. Galindo* (2006) 142 Cal.App.4th 531, 536; see *In re Howard N.* (2005) 35 Cal.4th 117, 132.)

We review an order to extend commitment under section 1026.5 by applying the substantial evidence test, examining the entire record in the light most favorable to the order to determine whether a rational trier of fact could have found the requirements of the statute satisfied beyond a reasonable doubt. (*Zapisek, supra*, 147 Cal.App.4th at p. 1165.) A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment. (*Bowers, supra*, 145 Cal.App.4th at p. 879.)

13

*Mental Disease, Defect, or Disorder*

The trial court found that defendant's diagnosis of personality disorder NOS constitutes a "mental disease, defect, or disorder" under section 1026.5. Defendant attacks this finding by renewing Dr. Fennell's claim that personality disorder NOS does not qualify under the statute, and by asserting that Dr. Deane mistakenly concluded it does so as a matter of law. Both attacks fail.

*Blakely, supra*, 60 Cal.App.4th 202, on which defendant relies, does not support him. As the trial court stated, *Blakely* holds that whether any alleged mental disease, defect, or disorder causes a person to represent a substantial danger of physical harm to others is "a not a question of law, but rather one for the trier of fact to be resolved with the assistance of expert testimony. [Citations.]" (*Id*. at p. 213.) Thus, Dr. Fennell's apparent conclusion that *Blakely* held personality disorder NOS could not qualify under section 1026.5 as a matter of law was simply wrong.[5] This was a question of fact which the trial court resolved based on the expert testimony of Dr. Deane that defendant's dangerous past conduct was chiefly motivated by his personality disorder, and if he were released without supervision it was likely that that disorder would again motivate him to endanger others.

Defendant asserts that if his Axis II diagnosis had been antisocial personality disorder, it might have been proper to find he has a qualifying condition under section

---

[5]     Defendant asserts Dr. Fennell did not so conclude because he said: "[U]nder case law, under *Blakely* the Court allowed that for purposes of -- to be handed over to the trier of fact, that anti-social personality disorder could be considered a qualifying disorder under 1026.5." We are not persuaded.

Dr. Fennell failed to recognize that under *Blakely* whether personality disorder NOS "could be considered a qualifying disorder under 1026.5" is *also* a question for the trier of fact. When asked if this disorder met the statutory criteria, he stated: "No, it does not," then cited *Blakely* as authority. Thus, so far as we can decipher Dr. Fennell's views, we think the trial court got them right.

1026.5, but that since he was not so diagnosed, *Blakely* is inapposite. As we have shown, defendant misreads *Blakely*, and his discussion of antisocial personality disorder is a red herring.

Finally, it is immaterial whether Dr. Deane believed personality disorder NOS qualifies under section 1026.5 as a matter of law. The trial court properly relied not on Dr. Deane's understanding of the law but on the factual evidence he presented, which Dr. Fennell did not materially dispute.

Substantial evidence supports the trial court's finding that defendant suffers from a mental disease, defect, or disorder within the meaning of section 1026.5.

*Substantial Danger of Physical Harm to Others By Reason of Mental Disease, Defect, or Disorder*

As Dr. Deane explained, there is no credible evidence that defendant has learned to control the manifestations of his personality disorder outside a hospital setting. Even in that setting he remained defiant toward staff, to the point of acting against his own medical interests. He refused to treat a potentially terminal illness, suggesting that he did not value his own life, let alone the lives of others. He had no support system in the community, having cut off relations with his son. He refused to seek support through CONREP and "philosophically" rejects 12-step programs. He began purporting to deal with his substance abuse problem and making a relapse prevention plan only on the brink of his recommitment hearing. His "plan" appeared to consist only of physically avoiding temptation. Even Dr. Fennell admitted that this plan might fail, and if defendant succumbed to temptation again, the paranoia, penchant for offense-taking, grudge-forming, and hostility to authority that methamphetamine "exacerbated," and which caused defendant's violent prior offenses, would resurface. Ample evidence showed that defendant remained dangerous to others by reason of his mental disease, defect, or disorder.

15

Relying on *In re Anthony C.* (2006) 138 Cal.App.4th 1493 (*Anthony C.*), defendant asserts that Dr. Deane's "conjectural testimony of what 'may' happen 'if' [defendant] relapsed on alcohol or meth was too speculative to prove 'a substantial danger' beyond a reasonable doubt." This argument fails for several reasons.

First, defendant wrongly asks us to reweigh the evidence. Second, defendant ignores the fact that Dr. Fennell agreed with Dr. Deane as to the likely consequences of a relapse. Third, *Anthony C.* is inapposite. There, the expert opined that a juvenile offender would be dangerous if released from confinement, but based his opinion only on the minor's past offenses and his admission that he needed treatment, which could actually have counted in his favor. (*Anthony C., supra*, 138 Cal.App.4th at p. 1508.) Here, Dr. Deane based his predictions of defendant's future dangerousness not only on his past offenses but on his entire history in confinement, which showed (except for the sham of cooperation just before the hearing) that he did not think he needed treatment and did not want to change.

Defendant further asserts that even if substantial danger was proven, "the causative nexus by reason of a mental disease, defect or disorder was not proven beyond a reasonable doubt." He relies on *People v. Cuevas* (2013) 213 Cal.App.4th 94 (*Cuevas*). His reliance is misplaced. The appellant there was confined under a statute governing the commitment of "mentally retarded" persons said to be a danger to themselves or others. (*Id.* at p. 103.) The evidence showed that his dangerous behavior was not due to his mental retardation, but to his independently diagnosed mental illness. (*Id.* at pp. 107-108.) The appellate court held only that he should not have been committed under the statute that applied to mentally retarded persons, expressing no view as to whether commitment under some other statutory scheme might have been appropriate. (*Id.* at p. 108 & fn. 11.) Although defendant cites *Cuevas* as support for his claim that "[i]f he relapsed with the use of alcohol or meth, his dangerousness would not be by reason of a

16

mental disease, defect or disorder proven beyond a reasonable doubt," it does not in any way support that claim.

*Substantial Difficulty in Controlling Behavior*

Dr. Deane opined that due to defendant's mental disorder he would have substantial difficulty in controlling his behavior outside an institutional setting, primarily because he had no desire to do so and had taken no effectual steps to prevent a relapse into substance abuse.[6] Dr. Fennell disagreed with that opinion only because he wrongly thought defendant's personality disorder NOS was irrelevant to whether he could avoid relapsing. Thus, the experts agreed that there was a strong possibility defendant would fail to control his behavior if released.

Defendant asserts that his lack of violence since he was hospitalized showed he could control his behavior. However, defendant's prior history of violence was connected to his substance abuse, which he was not able to engage in while hospitalized. Since he had no credible relapse prevention plan, his lack of violence in confinement was not substantial evidence that he could control his impulse toward violence on unsupervised release.

Defendant asserts that because Dr. Deane conceded defendant had "the capacity" to make himself more friendly and amenable to doing what the hospital wanted, there is no substantial evidence he had serious difficulty in controlling his dangerous behavior. This is a non sequitur. The issue is not whether defendant could put on a facade of

---

[6] Defendant characterizes Dr. Deane's opinion that defendant's personality disorder NOS would cause him substantial difficulty in controlling his behavior as an "ipse dixit" statement. If defendant means that Dr. Deane could not properly opine on this point, he is mistaken. As noted, a single expert opinion as to a person's dangerousness is substantial evidence to justify the extension of his commitment, and the trier of fact is entitled to rely on expert testimony to decide whether the defendant has a mental disorder within the meaning of section 1026.5. (*Bowers, supra*, 145 Cal.App.4th at p. 879; *Blakely, supra*, 60 Cal.App.4th at p. 213.)

17

friendliness and cooperation in the hospital setting in order to achieve his goal of unsupervised release, but whether he would have serious difficulty in controlling dangerous behavior once he had attained that goal and no longer had expert help or support to keep him on the straight and narrow. The trial court was entitled to rely on Dr. Deane's opinion that defendant's personality disorder would cause him to have such difficulty.

Defendant has shown no error in the trial court's ruling.

### DISPOSITION

The order extending defendant's commitment is affirmed.


                                          NICHOLSON       , Acting P. J.


We concur:


       MURRAY        , J.


       HOCH         , J.