Filed 12/20/23  P. v. Goodwin CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JASON GOODWIN,<br><br>Defendant and Appellant. | A167368<br><br>(Solano County<br> Super. Ct. No. FCR206480) |

Defendant Jason Goodwin (appellant) appeals from the trial court's order extending his involuntary commitment to a state hospital for two years pursuant to Penal Code section 1026.5, subdivision (b).[1]  Appellant contends substantial evidence does not support the court's finding that he posed a substantial danger of physical harm to others because his "mental illness caused him serious difficulty controlling [his] dangerous behavior."  He further contends double jeopardy bars his retrial.  Because a qualified expert concluded that appellant, by reason of his mental disorders, presented a substantial danger of physical harm to others if released into the community after applying a scientifically validated violence risk assessment tool, we find substantial evidence to support the extension of appellant's commitment and affirm.  We therefore do not address whether double jeopardy bars his retrial.

---

[1] Undesignated statutory references are to the Penal Code.

1

## BACKGROUND

### A. The Criminal Proceedings and Recommitment Petition

While on felony probation for putting "a fake bomb in the capitol building" in 2002, appellant entered another family's home with a rifle in March 2003.[2] Upon entering the home, he "confronted" the two parents and threatened to shoot them unless their daughter came downstairs. Appellant eventually left the home without harming anybody and fled. At the time of the fake bomb and firearm incidents, appellant was suffering from delusions and believed that he was "God" or "Jesus Christ."

Based on the 2003 firearm incident, appellant was charged with misdemeanors for aggravated trespass (§ 602.5) and exhibiting a firearm (§ 417, subd. (a)(2)), and felonies for making criminal threats (§ 422), first degree burglary (§ 459), assault with a firearm (§ 245, subd. (a)(2)), and possession of a firearm by a felon (former § 12021, subd. (a)(1)). The complaint also alleged that appellant personally used a firearm in connection with the burglary count (§1203.06, subd. (a)(1) & former § 12022.5, subd. (a)(1)) and the assault count (former § 12022.5). Appellant was found not guilty by reason of insanity under section 1026 and admitted to Napa State Hospital. His maximum date of commitment was January 26, 2023.

On May 24, 2022, appellant filed a petition for transfer to outpatient treatment under section 1026.2. On September 22, 2022, appellant withdrew the petition.

On October 5, 2022, plaintiff and respondent the People of the State of California (People) filed a petition for extension of appellant's commitment under section 1026.5, subdivision (b). In support of the petition, the People

---

[2] Appellant also made threats during the fake bomb incident.

submitted a written report from Dr. Elizabeth Burris, a Senior Psychologist Specialist (Forensic).

## B. Dr. Burris's Written Report

Dr. Burris's written report first noted that appellant, who was 44 years old at the time, had been committed to Napa State Hospital on April 29, 2005. It also described in some detail his diagnosed mental disorders, which included "[s]chizoaffective [d]isorder, [b]ipolar [t]ype, [m]ultiple [e]pisodes, [c]urrently in [p]artial [r]emission," "[o]bsessive [c]ompulsive [d]isorder", "[s]ocial [a]nxiety [d]isorder," and "[s]timulant [u]se [d]isorder, [a]mphetamine-[t]ype [s]ubstance, [s]evere, [i]n [s]ustained [r]emission, [i]n a [c]ontrolled [e]nvironment; [a]lcohol [u]se [d]isorder, [m]oderate, [i]n [s]ustained [r]emission, [i]n a [c]ontrolled [e]nvironment; and [c]annabis [u]se [d]isorder, [m]ild, [i]n [s]ustained [r]emission, [i]n a [c]ontrolled [e]nvironment."

The report then described appellant's psychosocial history, including his history of violence toward himself and others. For example, as a juvenile, appellant had a history of "suicide attempts via cutting his wrists" and once "brandished a knife at his mother" when he was 15. He also cut himself with a razor while awaiting trial in 2004 and asked for a razor so he could cut himself in 2005.

Immediately following his commitment to Napa State Hospital in 2005, appellant "engag[ed in several instances] of aggressive behavior", including "a physical altercation with a peer". In 2009, he assaulted three other patients in the hospital and broke his hand. He also had "multiple other instances of verbal and physical aggression towards staff and" patients that same year. After 2009, however, appellant began to improve and has no record of any "assaultive behavior" since 2009.

3

In July 2013, appellant was discharged from Napa State Hospital to CONREP, an outpatient treatment program. But in May 2014, he was admitted to a hospital for "dehydration and [l]ithium toxicity" and then re-hospitalized at Napa State Hospital. After he was released to CONREP for continued outpatient treatment in August 2014, appellant was re-hospitalized at Napa State Hospital in April 2015 for "a suicide attempt in which he reported[ly] took several entire bottles of his psychotropic medications and drank a 40 oz. bottle of beer." Appellant was again discharged to CONREP in April 2016. But soon after his discharge, he left the program without permission and was "found under a freeway with multiple lacerations on his left arm and the left side of his neck, which he noted were self-inflicted." Following this latest suicide attempt, appellant was recommitted to Napa State Hospital in May 2016. According to appellant, he felt "overwhelmed" and "uncomfortable" in CONREP and did not use his "coping skills" or seek support.

In 2019, appellant "punched his locker" "due to frustration regarding [his] symptoms of anxiety, which resulted in less group attendance, and frustration that he was not progressing in treatment." Appellant, however, has exhibited no "aggressive or rule-breaking behavior" since then.

Finally, the report described Dr. Burris's evaluation of appellant using the Historical Clinical Risk—20, version 3 (HCR-20v3) guidelines. The HCR-20v3 guidelines are "a comprehensive set of empirically derived professional guidelines that aid in the identification of ten historical, five clinical, and five risk management factors associated with violence." After evaluating appellant using those guidelines, Dr. Burris opined that appellant "continues to present a *high risk for violence* if he were discharged to the community without support." (Italics added.) She further concluded that

"[h]e would present a moderate risk for violence at this time should he [be] release[d] under CONREP supervision."

**C. The Court Trial**

Appellant requested a court trial and waived his right to a jury trial. During the one-day trial, the People presented three witnesses: (1) Dr. Sarah Moseman; (2) Dr. Leif Skille; and (3) Dr. Burris. Each of those witnesses was qualified as an "expert in the diagnosis and treatment of individuals with mental disorders." Appellant called his sister as his only witness. Their testimony is summarized below.

1. *Dr. Moseman*

Dr. Moseman is a unit psychologist at Napa State Hospital who has worked with appellant for two years. Dr. Moseman diagnosed appellant with schizoaffective disorder, bipolar type, obsessive-compulsive disorder, social anxiety disorder, and three substance use disorders: stimulant use disorder, amphetamine type; alcohol use disorder; and cannabis use disorder. She testified that appellant's obsessive-compulsive and social anxiety disorders were not in remission but his schizoaffective disorder, bipolar type, characterized as a lifelong illness, was.

Some of the past symptoms of appellant's schizoaffective disorder were paranoid delusions with religious or grandiose content, auditory and visual hallucinations, and shifts in mood. But Dr. Moseman had not observed appellant display, nor had appellant reported, any of those symptoms during the past two years.

As a result, appellant's obsessive-compulsive and social anxiety disorders were the mental health issues he had been dealing with the most during the past two years. Dr. Moseman further confirmed that, in the past two years, appellant had not attempted to hurt himself.

5

Dr. Moseman explained that appellant is currently in unit T10, a discharge preparation unit for patients who have demonstrated behavioral and clinical stability. If a patient performs well in this unit, then the Hospital's forensic services department will review the patient's case to determine if he is suitable for community treatment. Unit T10 has less restrictions than other units, and appellant "is able to escort himself to and from treatment groups or work within the secured fenced area, while being observed by staff." In addition, he has access to things that could be used as a weapon.

Dr. Moseman then testified that, before patients are released to the community, they must complete their "forensic action items." Appellant was given six items to complete, including continuing to improve his insight into the barriers that prevented him from getting help in the community, which led to his recommitment in 2016, and continuing to work on his treatment for obsessive compulsive disorder and his history of depression and suicidality. Dr. Moseman noted that his obsessive-compulsive disorder symptoms were, in part, responsible for one act of violence he had previously committed, but that the symptoms are "much more linked . . . to self-harm."

Dr. Moseman also testified that appellant "talked very clearly" about the link between his obsessive-compulsive disorder and his suicide attempts and was aware that he had to practice his coping skills for that disorder daily. Although she acknowledged that appellant had "some very good skills," she believed that he would benefit from developing additional ways to challenge his obsessive and compulsive thoughts, such as grounding techniques, journaling, or playing music. When asked whether appellant had availed himself of the programs offered at the Hospital, she replied, "[y]es. He is participating and willing to attend the treatment that is available." Dr.

6

Moseman also confirmed that appellant had "sufficient" insight into his mental illnesses at the Hospital. Finally, she noted that appellant preferred to be released on his own so he could live with his family in Oregon and claimed that he would get his medications from county mental health services in Oregon.

According to Dr. Moseman, when appellant previously failed in his outpatient treatment program in 2016, he did not seek treatment or help and was unable to explain in much detail why. Appellant did tell her that he decompensated when he was in the program due to stress and feeling overwhelmed from the additional freedom and the many rules he had to follow. He also confirmed that, while he was in the program, he drank alcohol as "liquid courage" in a suicide attempt. Appellant, however, stated that, in the future, he would tell his support system, talk to "CONREP or treatment providers, reach out to family," go to the emergency room, or call 911. Dr. Moseman also confirmed that, during the past two years, appellant had no issues with substance abuse, and had not been a danger to others.

2. *Dr. Skille*

Dr. Skille is a staff psychologist at Napa State Hospital who diagnoses and treats patients with medication. He had been treating appellant since March 2021. Dr. Skille diagnosed appellant with the same mental disorders as Dr. Moseman.

Dr. Skille described the delusions—that he "thought he was Jesus Christ" and "wanted everyone to use methamphetamine"—that led to appellant's commission of the instant offenses and his conviction for placing a fake bomb. He further testified that, if appellant stopped taking his medications, appellant would "highly likely . . . become psychotic again" and his mood "would become unstable again." According to Dr. Skille, appellant's

7

current medication regimen, including the recent addition of Abilify to help appellant "better control" his obsessive-compulsive disorder, appeared to be effective, and appellant had been taking his prescribed medications voluntarily.

Dr. Skille also discussed why appellant failed in CONREP, his previous outpatient treatment program, in 2016. According to Dr. Skille, appellant was "very stressed" because of the lack of structure, because "[e]veryone was using drugs," and because "he wasn't on very good medications at the time." As a result, appellant "drank," "used pot," "went AWOL," "ended up cutting himself," attempted suicide, and was eventually discovered by unhoused people. After appellant returned to Napa State Hospital in 2016, however, he was prescribed new medications—which have stabilized his schizoaffective disorder.

According to Dr. Skille, appellant was admitted to the discharge unit in March 2021 and is currently in that unit. He described appellant's level of insight regarding his symptoms, including his hallucinations, delusions, schizophrenia and mania, as "good." In particular, Dr. Skille commented that appellant understood his schizoaffective disorder "well." Indeed, he opined that appellant accepted his diagnoses and understood that he needed to take medications for the rest of his life.

At the same time, however, Dr. Skille expressed concern that appellant changed his mind from wanting the extra support available at an Institution for Medical Disease (IMD) to wanting to live on his own with his family. He explained that appellant's insight into the level of support that he needed was "a little limited." Dr. Skille also expressed concern that he had never spoken with appellant's family to find out what support he would receive from them.

As a result, Dr. Skille concluded that appellant needed a structured outpatient treatment program like CONREP or an IMD and could benefit from the extra support provided in an IMD. He noted that appellant wanted to live with his family in Oregon, but did not appear to have a "detailed plan" for getting the treatment that he needed. On the other hand, Dr. Skille believed that appellant would voluntarily take his medications for life if they were provided to him or if medical appointments were set up for him. Regarding the forensic "action items" appellant had to complete before being released by the Hospital for community treatment, Dr. Skille testified that appellant was "pretty much just about done" and that he "is doing just about as good as he can do at this point." Appellant was taking his medications, understood his diagnoses, and participated in his "substance groups." He also understood that if he stopped taking his medications, it "could lead him to decompensate and become dangerous again." Dr. Skille confirmed that appellant had not been a danger to himself or others since March 2021.

Finally, Dr. Skille acknowledged that appellant can manage his obsessive compulsive disorder and obtain his medications outside the hospital, and, if discharged, he can receive up to 30 days of medication. Dr. Skille also acknowledged that he "never interacted" with appellant's family and that living with family members "committed to not having drugs or alcohol" would be "good" for appellant. Dr. Skille then admitted that he and his staff at the Hospital do not assist patients with living independently with their families.

3. *Dr. Burris*

Dr. Burris is a senior psychologist supervisor at Napa State Hospital. She conducted a two-hour interview with appellant in August 2022 but has never treated him. During the interview, Dr. Burris noted that appellant

9

displayed symptoms of schizoaffective disorder, such as a "flattened" facial expression, "thought blocking,"[3] and "disorganized speech." As a result, she concluded that his schizoaffective disorder was only "in partial remission." Dr. Burris also observed that appellant appeared "quite anxious."

During the interview, appellant admitted that he used to suffer from auditory and olfactory hallucinations and paranoia and had a history of substance abuse. As for the offenses that resulted in his commitment to the Hospital, appellant admitted that he "went to a neighbor's house" and threatened to shoot the parents of his female neighbor if she did not come downstairs. He also admitted that he was suffering from "paranoid beliefs and some delusions" at that time but denied that he had a gun.

Although appellant acknowledged that he had schizoaffective, obsessive-compulsive, and social anxiety disorders during the interview, Dr. Burris noted that he had difficulty describing his symptoms "[a]t times." She also testified that appellant appeared to have difficulty discussing past triggers, early warning signs, and destabilizing factors. Dr. Burris observed that appellant seemed more focused on his obsessive-compulsive disorder than his schizoaffective disorder. For example, appellant attributed his previous failures in CONREP more to his obsessive-compulsive disorder than his schizoaffective disorder.

In explaining the reasons behind his failures in CONREP, appellant told Dr. Burris that he was "stressed out" and "overwhelmed" and did not use his coping strategies or seek help. (Bolding omitted.) He explained that he was not ready for the level of freedom that he had in CONREP at that time.

---

[3] Dr. Burris described "thought blocking" as appellant "would be talking about something and just lose his train of thought"—which would "require prompting to get back to" the original topic of discussion.

As a result, he "smoked marijuana," "drank a 40-ounce beer," and "took several bottles of his psychiatric medications in order to attempt suicide." Appellant also admitted that he suffered from "olfactory hallucinations" while he was in CONREP but did not suffer from any other delusions. Dr. Burris conceded that appellant did not suffer from any "grandiose" delusions in CONREP and that his olfactory delusions did not "cause him to be a danger to others while he was on CONREP." (Bolding omitted.) She also acknowledged that appellant appeared to have no issues with his schizoaffective disorder after his medications were changed following his return to Napa State Hospital in 2016.

During the interview, appellant stated that he was willing to take his medications and would seek individual therapy. He also told Dr. Burris that he wanted to move to Oregon to live with his family. According to appellant, his sister and social worker would "work together to try to find him some community mental health treatment." Dr. Burris did not, however, believe that this was the best plan for appellant. Instead, she believed that appellant "would be better served by going through CONREP and having additional support and supervision . . . ." Although Dr. Burris believed that appellant had developed "good coping skills," she did not think he was "ready" to be out on his own "yet." In support, she noted that when she asked appellant why he thought "individual therapy" would be important, appellant responded that "it makes it extra flaming hot." According to Dr. Burris, this response suggested a lack of insight on the part of appellant.

Following the interview, Dr. Burris concluded that appellant could "be a danger to others" if released, given his past "risk of violence." According to Dr. Burris, her greatest concern was appellant's "more limited insight into his symptoms of schizoaffective disorder"—which would not be enough to

ensure that he obtained and received "successful community treatment." In particular, she was concerned about appellant's "lack of planning for treatment" for his schizoaffective disorder. She noted that his plan to obtain his sister's help should be better developed if he was to be released into the community. She also "felt like [appellant] would be better served by going through CONREP and having additional support and supervision in the community, given his past instances of community treatment." According to Dr. Burris, this would "be the most helpful for him and the least risky way for him to get out of the hospital." However, she admitted that appellant's medications had been changed since she interviewed him and that his treatment providers would have more "recent information" about his level of insight into his disorders. (Bolding omitted.)

4. *Appellant's Sister*

Angela D., appellant's younger sister, testified that she was aware of her brother's mental health diagnoses and that, if released, he could live with her. She, however, noted that the current plan was for appellant to live with their parents, who lived near her. Angela D. also noted that their sister, who is willing to provide support, lives nearby and that their other brother is "is in the process of securing a job" in Oregon and will be only a few hours away by car.

Angela D. testified that both she and their father have bipolar disorder. Her father's symptoms had "mellowed out with age," and she successfully managed her disorder with medication. She stated that she did not believe her bipolar disorder affected her ability to care for her brother and was confident she could provide a safe space for him.

Angela D. also testified that she and her family had begun planning for appellant's possible return approximately two months ago. As a result, she

12

was familiar with support services in her community and had already contacted them about setting up services for appellant. According to Angela D., county mental health services in her community offered medication support and various forms of therapy, including behavioral and family therapy. She also had a plan if there were any delays in obtaining help from county mental health services, including the use of the Oregon Health Plan. In addition, Angela D. had gathered information about substance abuse support for appellant, including the phone numbers for Alcoholics Anonymous and Narcotics Anonymous in her area. Finally, she noted that their other sister was already familiar with mental health services in the area because she had to obtain those services for her oldest son.

Angela D. confirmed that she was committed to helping appellant obtain his medications and to providing a sober environment for appellant. She also stated that she and her family would drive appellant to his appointments and would assist appellant if he "was having [a] crisis." (Bolding omitted.) She further explained that she and her family were already familiar with "creating safety plans" for family members suffering from a mental health crisis.

Angela D. admitted that she had no contact with anyone at Napa State Hospital during the past 20 years but noted that she was never invited by the Hospital to participate in any treatment plan and did not know that she could do so. She believed it was difficult for appellant to be far from his family, and it hurt him not to have his family closer to him for support.

## D. The Trial Court's Findings

Following the trial, the trial court found that "there is sufficient evidence that [appellant] represents a substantial danger." The court expressed concern about appellant's "insight" and found "the concerns raised

13

by the doctors in that regard [to be] well placed." The court also expressed concern about "a lack of structure" if appellant were released outright. The court therefore extended appellant's commitment to January 26, 2025.

Appellant timely appealed from the trial court's order.

## DISCUSSION

Appellant contends there is insufficient evidence that his mental disorders caused him to be a substantial danger to others because he had serious difficulty controlling his dangerous behavior. We disagree.

### A. Standard of Review

We review an order to extend a commitment under section 1026.5 for substantial evidence. (*People v. Williams* (2015) 242 Cal.App.4th 861, 872 (*Williams*).) Under that test, we examine "the entire record in the light most favorable to the order to determine whether a rational trier of fact could have found the requirements of the statute satisfied beyond a reasonable doubt." (*Ibid.*) "While inferences may constitute substantial evidence in support of a judgment, they must be the probable outcome of logic applied to direct evidence; mere speculative possibilities or conjecture are infirm." (*People v. Jenkins* (2023) 95 Cal.App.5th 142, 150–151 (*Jenkins*).)

### B. Legal Standard

Under section 1026.5, a defendant found not guilty by reason of insanity (NGI) may be committed to a state hospital for a period no longer than the maximum prison sentence for his or her offenses. (§ 1026.5, subd. (a)(1).) However, a NGI defendant may be committed beyond the term prescribed by subdivision (a) if he has "been committed under Section 1026 for a felony and," after a trial, the trier of fact finds that he or she, "by reason of a mental disease, defect, or disorder[,] represents a substantial danger of physical harm to others." (§ 1026.5, subds. (b)(1) & (3).) Thus, to extend the

14

commitment of a NGI defendant, the trier of fact must find "beyond a reasonable doubt" that the defendant " 'represents a substantial danger of physical harm to others' [citations] and has 'serious difficulty controlling his [or her] potentially dangerous behavior.' " (*People v. Cheatham* (2022) 82 Cal.App.5th 782, 789 (*Cheatham*).) If the trier of fact makes these findings, then the NGI defendant may be recommitted "for an additional period of two years from the date of termination of the previous commitment." (§ 1026.5, subd. (b)(8).)

### C. Analysis

Appellant concedes that he suffers from several mental disorders, including schizoaffective disorder, bipolar type, obsessive-compulsive disorder, social anxiety disorder, and three substance use disorders (methamphetamine, cannabis, and alcohol use). He also does not dispute that, in the past, his mental disorders caused him to be a substantial danger of physical harm to others. Thus, the sole issue on appeal is whether there is substantial evidence to support the trial court's finding beyond a reasonable doubt that appellant would have serious difficulty controlling his potentially dangerous behavior because of his mental disorders. We conclude that there is based on Dr. Burris's psychiatric evaluation of appellant using the HCR-20v3 guidelines.

"A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment." (*Williams*, *supra*, 242 Cal.App.4th at p. 872.) But " 'expert medical opinion evidence that is based upon a " 'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.' ' " (*People v. Redus* (2020) 54 Cal.App.5th 998, 1011 (*Redus*).)

15

Here, Dr. Burris, who was qualified as an expert in psychology and mental disorders, opined in her written report in support of the petition that appellant, by reason of his mental disorders, "represents a substantial danger of physical harm to others and . . . has serious difficulty controlling his dangerous behavior." (Bolding omitted.) She reached this opinion with "a reasonable degree of psychological certainty" based on her "review of records, collateral contact with [appellant's] present treatment providers, and [her] interview of [appellant] . . . ." (Bolding omitted.) Most notably, Dr. Burris evaluated appellant's risk of violence using the HCR-20v3 guidelines, a well-established "structured violence risk assessment instrument[]." (*Jenkins*, *supra*, 95 Cal.App.5th at p. 157 (conc. opn. of Buchanan, J.).) The HCR-20v3 guidelines "provide a structured framework for . . . predicting a person's risk of violence" that "has been validated in peer-reviewed studies." (*Ibid.*) By combining "a structured use of empirically validated risk factors" with her "professional judgment," Dr. Burris provided a " 'structured professional judgment' " of appellant's risk of violence. (*Id.* at p. 158.)

Because appellant does not challenge Dr. Burris's qualifications or her use or implementation of the HCR-20v3 guidelines, her expert opinion satisfies the statutory requirement of "proof beyond a reasonable doubt that [appellant] currently poses a substantial danger of physical harm to others." (See § 2972, subds. (a)(2) & (c); see also *People v. Johnson* (2020) 55 Cal.App.5th 96, 106–107 (*Johnson*).) This is because her opinion is not based on mere guesswork or conjecture. (*Redus*, *supra*, 54 Cal.App.5th at p. 1011.) Rather, it is based on her use of a structured risk assessment tool that has been shown to reasonably predict a person's risk of violence. (See *Jenkins*, *supra*, 95 Cal.App.5th at p. 157 (conc. opn., of Buchanan, J.).) Thus, Dr. Burris's structured professional judgment that appellant poses a substantial

risk of harm to others if released into the community, by itself, constitutes substantial evidence justifying the extension of his commitment. (*Williams*, *supra*, 242 Cal.App.4th at p. 875, fn. 6.)

Admittedly, Dr. Burris's trial testimony was not as clear as her report. For example, she only testified that appellant "*could* be" a "danger to others" if released. (Italics added, bolding omitted.) But to the extent Dr. Burris's trial testimony may have been insufficient to support an extension of appellant's commitment, her written report remedies any deficiencies in that testimony. Because the trial court, without objection from appellant, took judicial notice of its "records," including Dr. Burris's report, "as needed" and relied on that report in ordering appellant's recommitment, because appellant did not object to the People's reliance on the report in its Respondent's Brief (see *Ross v. Superior Court* (2022) 77 Cal.App.5th 667, 681 [failure to respond in reply brief constitutes implicit concession of argument in respondent's brief]), and because we must view the evidence in the light most favorable to the recommitment order (*Williams*, *supra*, 242 Cal.App.4th at p. 872), we find Dr. Burris's testimony, when considered in conjunction with her written report, sufficient to justify our affirmance of that order here.

That appellant has exhibited no aggressive behavior toward others since 2009 and has only posed a risk of harm *to himself* since then, even when he decompensated while in CONREP, does not compel a contrary conclusion. Appellant is correct that his "risk of danger to *others*, not his own welfare, is what was at issue at his . . . recommitment trial." (*Johnson, supra,* 55 Cal.App.5th at p. 110.) But Dr. Burris did not base her opinion solely on the risk to appellant's own welfare. Instead, she applied a scientifically validated

17

risk assessment tool and considered multiple risk factors empirically shown to be predictive of future violence.

Because the trial court relied upon the structured professional judgment of a qualified expert in extending appellant's commitment (see *Jenkins*, *supra*, 95 Cal.App.5th at p. 158 (conc. opn., of Buchanan, J.) [suggesting that trial courts, in determining whether a person is prone to violence, should rely on "structured risk assessment tools that yield more dependable and less subjective results" and that are "properly validated and correctly implemented by adequately trained clinicians"]), the cases cited by appellant reversing a recommitment order for insufficient evidence despite expert testimony are inapposite. None of the trial courts in those cases relied upon the structured professional judgment of a qualified expert who applied a structured risk assessment instrument. (See *Jenkins*, at pp. 155–156; *Cheatham*, *supra*, 82 Cal.App.5th at p. 794; *Redus*, *supra*, 54 Cal.App.5th at p. 1012; *Johnson*, *supra*, 55 Cal.App.5th at p. 109.) Thus, unlike the courts of appeal in those cases, we cannot conclude, in light of Dr. Burris's report and testimony, that no reasonable trier of fact could have found beyond a reasonable doubt that appellant "represents a substantial danger of physical harm to others." (§ 2972, subd. (e).)

## III. DISPOSITION.

The order extending appellant's commitment is affirmed.

18

                                        CHOU, J.

We concur.


SIMONS, Acting P. J.

BURNS, J.




*People v. Goodwin* / A167368

19