Filed 4/11/16  P. v. Grajeda CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C078691 |
| Plaintiff and Respondent, | (Super. Ct. No. 05F2543) |
| v. | |
| TULIO ERNESTO GRAJEDA, | |
| Defendant and Appellant. | |

Defendant Tulio Ernesto Grajeda appeals from the trial court's order extending his commitment to a state hospital under Penal Code[1] section 1026.5, subdivision (b). Defendant contends there is no substantial evidence:  (1) that he "currently presented a substantial danger of physical harm to others"; or (2) that he "presently suffered from a volitional impairment rendering him dangerous beyond his control."  We affirm.

---

[1]    Undesignated statutory references are to the Penal Code.

1

BACKGROUND

In 2005, the People charged defendant with carjacking, unlawful driving or taking of a vehicle, and giving false information to a police officer.  The People further alleged defendant was twice previously convicted of a serious or violent felony and served a prior prison term.

In 2007, the trial court found defendant not guilty by reason of insanity and committed him to the California Department of Health Care Services.  (§ 1026.)  His maximum commitment date was April 9, 2015.

Defendant was admitted to Napa State Hospital but was transferred to Patton State Hospital (Patton) in October 2013.  In October 2014, at the request of the medical director from Patton, the People petitioned the trial court to extend defendant's commitment.

Defendant waived a jury trial.  At the bench trial on February 11, 2015, the People called Dr. Michael Ilas and Grace Dobey, LCSW (licensed clinical social worker); defendant did not call any witnesses.

I

*Dr. Ilas's Testimony*

As a staff psychiatrist, Dr. Ilas saw defendant in the halls several times a week.  Dr. Ilas would ask defendant how things were going; defendant usually said very little in response.  Dr. Ilas also met with defendant individually once a month for a "doctor visit, med check, or . . . anything."  At these meetings, defendant would usually refuse to sit down and talk to Dr. Ilas about his commitment offense, saying only that he was fine.

Dr. Ilas also was part of defendant's treatment team, so along with the rest of the treatment team, he met with defendant quarterly.  At the quarterly meetings, the treatment team would discuss any problem behaviors, incidences, or general concerns regarding defendant.  In the year preceding the hearing, defendant attended two of the quarterly meetings but missed the meeting in December 2014.

2

Defendant was diagnosed with schizophrenia and antisocial personality disorder. Consistent with his schizophrenia diagnosis, defendant exhibited paranoid and grandiose delusions and showed a lack of insight into his mental illness. Specifically, defendant reported being part of a royal family and he believed that he had hundreds of millions of dollars, that he had been a CIA agent since he was 10, and that he was at times an engineer, a doctor, a scientist, and a surgeon. Defendant also believed he was at Patton on vacation from Napa State Hospital.

Because he lacked insight into his mental illness, defendant was not participating in his treatment. He had not enrolled in any "meaningful" groups that would support his recovery but participated at about 60 percent in exercise and leisure groups. Dr. Ilas specifically noted that defendant had not prepared a "WRAP" book since 2006. A "WRAP" book, Dr. Ilas explained, is a wellness and recovery plan written by defendant. It is a personal tool for patients to use in discussing their own mental illnesses and understanding the crimes they committed. The "WRAP" book also allows patients to demonstrate how they will handle a crisis after they are released and how they can avoid committing other crimes. In addition to being a tool for the patients, the "WRAP" book is a way for the treatment team to assess a patient's progress. When Dr. Ilas asked defendant why he had not prepared a "WRAP" book since 2006, defendant said only, "I'm not ready."

Consistent with his antisocial personality disorder diagnosis, defendant demonstrated a "global problem controlling impulsivity and dangerousness." Specifically, in his 15 months at Patton, defendant had between 12 and 14 rule violations related to verbal and physical aggression and inappropriate sexual conduct. In October 2013, defendant became agitated and physically aggressive, injuring three hospital staff. Defendant had to be restrained for eight hours even after he was given an emergent medication.

In December 2013, defendant was found with contraband. When confronted, he began threatening staff and became hostile. He had to be tranquilized. On another occasion, defendant exposed his genitals to a female staff member. When rebuked, he became hostile and had to be medicated.

In January 2014, there were multiple incidents of defendant's violating the rules. He took off his clothes in front of a female staff member. He twice threatened a rehabilitation therapist when his privileges were revoked. He physically assaulted a male staff member and had to be medicated. In the cafeteria, defendant became agitated and started threatening and cursing at patients and staff members; he had to be medicated. In violation of the rules, he left his group while it was outside and had to be redirected. On the last day of January 2014, defendant was sexually inappropriate and then verbally abusive with Dobey, his social worker.

In February 2014, defendant struck another patient with a chair in the cafeteria. Again, he had to be medicated. In April 2014, defendant became verbally aggressive, threatening a staff member. And in November 2014, defendant was sexually inappropriate with a female patient.

After striking another patient with a chair in February 2014, defendant began voluntarily taking Zyprexa, an antipsychotic drug intended to reduce psychosis, impulsivity, aggression, and hostility. Since he started taking Zyprexa, defendant's verbal, physical, and sexual aggression had decreased but had not been extinguished. Defendant's delusions and hallucinations also decreased and he was more emotionally stable. Nevertheless, even with the improvements seen in defendant, defendant had not yet demonstrated an extended period of stability. Defendant continued to believe he was not mentally ill, and despite taking Zyprexa, defendant continued to exhibit dangerous behavior.

Thus, at the time of the commitment hearing, it was Dr. Ilas's opinion that, as a result of defendant's mental illness, he continued to pose a substantial danger of physical

4

harm to others.  Dr. Ilas explained that having both schizophrenia and an antisocial personality disorder created a greater risk of violence:  "one promotes dangerousness of the other.  And [defendant] does not accept he has a mental illness.  He would be at high risk of not getting medical treatment.  And frequently with schizophrenia, without medical treatment, patients decompensate.  They get more symptomatic, which increases the risk of dangerousness even further."

It was Dr. Ilas' opinion that the combination of schizophrenia and antisocial personality disorder made it seriously difficult for defendant to control his dangerous behavior because both impair judgment and impulse control.

## II

### *Dobey's Testimony*

Dobey first met defendant in November 2013.  As a licensed clinical social worker at Patton, she performed many jobs that put her in direct contact with defendant.  Dobey performed psychosocial assessments for the patients, coordinated the patients' discharge from the hospital, was a community liaison with CONREP (the community outpatient treatment program), and was a liaison between the treatment team and family members or other outside agencies.  As a treatment team member she also participated in the quarterly meetings, ran group therapy, and conducted individual therapy.

Dobey saw defendant weekly in his group therapy sessions, which defendant began in December 2014.  She described a movie group that defendant attended but said he did not participate in any meaningful way.  Specifically, the group was watching a movie about schizophrenia, and the members were invited to talk about the movie and also about their own experience with mental illness.  Defendant would talk about the movie but would not relate the movie to his own experience.

During an interview with defendant just prior to the hearing, defendant told Dobey he had no remorse for the crime he committed and refused to take any responsibility for the crime.  He said only that he had hallucinated and no one was hurt.

5

Defendant repeatedly told Dobey he did not have a mental illness.  He was not convinced he even needed the Zyprexa that he was taking and had refused his medication on January 5, 2015.  When Dobey asked defendant why he had not written a "WRAP" book, he said he did not need to because he was at Patton either on vacation or because he was overseeing certain programs at Patton.  Defendant also told Dobey that the Department of State Hospitals Conditional Release Program had accepted him into their outpatient program and he was being released in April, neither of which was true.  In fact, the department specifically found defendant was not ready to be released.

## III

### *The Court's Ruling*

The court ruled defendant was not ready for release.  Defendant had improved but had not improved enough.  Defendant continued to act aggressively on the medication, continued to deny his mental illness, and had at least one occasion of not taking his medication.  The court specifically noted that even defendant did not think he was ready: "that's the reason he wasn't doing his WRAP notebook.  He said, I'm not ready."  Thus, the court found that because of defendant's schizophrenia and antisocial personality disorder, he continued to present a substantial danger of physical harm to others.  The court extended defendant's commitment for two years beginning April 9, 2015.

## DISCUSSION

Defendant contends the trial court's findings that defendant, by reason of mental disease or disorder, currently represented a substantial danger of physical harm to others, and was dangerous beyond his control because of his mental illness, were not supported by substantial evidence.  We disagree.

"Under section 1026.5, subdivision (b)(1), '[a] person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of

6

physical harm to others.'  The last element also requires proof that the person has serious difficulty controlling his dangerous behavior.  [Citations.]

"We review an order to extend commitment under section 1026.5 by applying the substantial evidence test, examining the entire record in the light most favorable to the order to determine whether a rational trier of fact could have found the requirements of the statute satisfied beyond a reasonable doubt.  [Citation.]  A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment."  (*People v. Williams* (2015) 242 Cal.App.4th 861, 872.)

I

*Substantial Danger Of Physical Harm To Others*

*By Reason Of Mental Disease, Defect, Or Disorder*

Defendant was diagnosed with schizophrenia and antisocial personality disorder. At Patton, defendant had a lengthy history of being violent, aggressive, and sexually inappropriate.  As Dr. Ilas explained, defendant showed improvement with the Zyprexa but continued to demonstrate aggressive behavior.  On at least one occasion after starting the medication, defendant was verbally aggressive with a staff member, threatening him. On another occasion, he was sexually inappropriate with a female patient.

Moreover, at the time of the hearing, defendant had only just begun participating in his own treatment.  He did not start participating in group therapy until December 2014, shortly before the recommitment hearing, and even then he was not participating in any meaningful way.  Defendant also had not begun to write his "WRAP" book, telling Dr. Ilas he was not ready.  Defendant was taking his medication, but he was not convinced he needed it and had already refused it on at least one occasion.  Defendant also continued to deny he had a mental illness.

Additionally, as described by Dr. Ilas, having both schizophrenia and an antisocial personality disorder creates a greater risk defendant would not obtain treatment once outside the hospital: "one promotes dangerousness of the other. And [defendant] does not accept he has a mental illness. He would be at high risk of not getting medical treatment. And frequently with schizophrenia, without medical treatment, patients decompensate. They get more symptomatic, which increases the risk of dangerousness even further."

We thus conclude the evidence was sufficient to show that defendant remained dangerous to others by reason of his mental disease, defect, or disorder.

II

*Substantial Difficulty In Controlling Behavior*

Defendant also argues there is insufficient evidence to show he had substantial difficulty in controlling his behavior because Dr. Ilas "gave no facts to support his opinion." In support of his argument defendant relies on *People v. Galindo* (2006) 142 Cal.App.4th 531. *Galindo*, however, is inapposite because in *Galindo* there was no finding -- and no expert opinion -- that the defendant had substantial difficulty controlling his behavior. (*Id.* at p. 539.)

Here, it was Dr. Ilas's express opinion that defendant had substantial difficulty controlling his behavior. Dr. Ilas explained that a person suffering from both schizophrenia and antisocial personality disorder would have great difficulty controlling his or her behavior by the very nature of the illnesses. Dr. Ilas's opinion was supported by the evidence that even on the medication, defendant continued to exhibit aggressive behavior, albeit less frequently.

We conclude substantial evidence shows defendant had significant difficulty controlling his behavior.

8

DISPOSITION

The order extending defendant's commitment two years beginning on April 9, 2015, is affirmed.

/s/
Robie, J.

We concur:

/s/
Nicholson, Acting P. J.

/s/
Renner, J.