Filed 9/13/16  P. v. Regan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>SHANNA LAYNE REGAN,<br><br>     Defendant and Appellant. | F071028<br><br>(Super. Ct. No. MCR023744)<br><br>**OPINION** |

-ooOoo-

**THE COURT**<sup>*</sup>

APPEAL from a judgment of the Superior Court of Madera County.  Joseph A. Soldani, Judge.

Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Levy, Acting P.J., Detjen, J. and Smith, J.

## INTRODUCTION

Appellant Shanna Layne Regan contends substantial evidence does not support extension of her commitment pursuant to Penal Code[1] section 1026.5, subdivision (b). We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On January 9, 2006, a complaint was filed charging Regan with a violation of section 4502, subdivision (a) and Business and Professions Code section 4140. The complaint alleged that Regan had three prior serious or violent felony convictions, including a robbery conviction in 1991 and a robbery and kidnapping conviction in 1994.

On November 13, 2006, the trial court appointed Doctors Robert Taylor and Michael Zimmerman to assess Regan's sanity pursuant to section 1026. On January 19, 2007, Regan signed a plea form and waiver of rights. The plea form noted that Regan faced a sentence of 25 years to life if convicted of the section 4502, subdivision (a) offense, a felony, because of her prior strike offenses. In exchange for a plea of guilty to the section 4502 offense, it was agreed that two of Regan's prior strikes and the other charge would be dismissed.

The trial court accepted Regan's plea and dismissed the other charge and two of the strike offenses. A court trial on Regan's sanity was held and the trial court found that due to a "psychotic and depressed state," Regan "did not have the capacity to understand the nature and quality of her actions and was not able to differentiate right from wrong" at the time of the offense. On February 6, 2007, the trial court issued an order committing Regan to Patton State Hospital for a period not to exceed eight years.

On October 9, 2014, the People filed a motion to extend Regan's civil commitment pursuant to section 1026.5, subdivision (b). The motion asserted that Regan currently was receiving treatment at Metropolitan State Hospital (Metropolitan) and the

---

[1] References to code sections are to the Penal Code unless otherwise specified.

Metropolitan staff were of the opinion that Regan posed a substantial danger of physical harm to others by reason of mental disease, defect, or disorder. The staff recommended an extension of commitment pursuant to section 1026.5, subdivision (b) and had recommended the District Attorney seek an extension of Regan's commitment. Attached to the petition were an evaluation of Regan's current mental condition by a staff psychiatrist and the medical director's recommendation for an extension of commitment.

A jury trial on the petition to extend commitment commenced on January 6, 2015. Dr. Alicia Johnson, a forensic psychologist at Metropolitan, testified that she had been Regan's primary psychologist since 2012. Johnson diagnosed Regan as having the following conditions: bipolar one disorder, depressed, severe, with psychotic feature; polysubstance dependence; borderline personality disorder; and antisocial personality disorder.

Symptoms of Regan's bipolar disorder included depression, suicidal ideation, mania, and a history of irritability which can lead to aggressive thoughts, which had "been characterizing her more recently within the past year." In December 2012, Regan made a suicide attempt; in 2014, Regan indicated she was "33 percent contemplating suicide."

Regan also had a problem with substance abuse while hospitalized; she had inappropriately used Wellbrutin, Tramadol, and Ativan. Johnson discussed Regan's criminal history while incarcerated; in 2005, Regan was in possession of a razor; another time, Regan physically attacked another patient who was in restraints.

Regan was sensitive to loud noises and other patients could trigger an angry response from her. Regan had a history of sabotaging her own treatment. Regan had told nurses she cannot use coping skills; she just wants medication. Johnson "can't count how many times [Regan] has made statements of violence" in order to obtain emergency medication.

There was a strong connection between Regan's diagnosis, suicidal ideation, substance abuse, relationship instability, and criminal behavior. Johnson opined that if released into the community, Regan would be at great risk of hurting other people. Factors weighing against a release were Regan's lack of insight into her illness, substance abuse, and risk for violence; her reliance on medications, including emergency medications; her failure to follow treatment plans; and instability of symptoms. Johnson testified that Regan should not be released into the community due to a combination of factors including mental illness, craving for substances, violent tendencies, and verbalization of threats.

Dr. Christina Rim, a forensic psychiatrist at Metropolitan, also testified. Metropolitan is a controlled setting, with 24 hour-a-day treatment in a locked facility. Rim diagnosed Regan as having bipolar disorder, depressed, severe, with psychotic features; polysubstance dependence; antisocial personality disorder; and borderline personality disorder.

Regan had been depressed for most of the past year. Regan had been on anti-psychotic medication for the past year; consequently, Rim had not witnessed any psychotic episodes in the past year. Regan had received medication in April 2013 because she was hearing voices.

Rim had seen Regan exhibit poor frustration tolerance, difficulties with anger management, and poor relationships, all indicative of borderline personality disorder. Regan's disregard for the rules of the unit where she was housed and the use of illicit substances by obtaining them from other patients were indicative of antisocial personality disorder. Regan attempted to get over a fence and leave the facility in 2012. Antisocial personality disorder is minimized in a structured, locked, treatment setting like Metropolitan.

Rim opined that Regan had impaired judgment and insight with respect to her mental illness. Regan's mental illness was a chronic condition, which could be managed

4.

with medication and by managing stressors. The fact that Regan has multiple disorders increases the risk of behaviors that are dangerous to others. The overall combination is difficult to manage; Regan needed an extensive combination of treatment. Rim opined that Regan's disorders were aggravating one another.

Regan was too dangerous to be released into the community, because her symptoms and behaviors were not being managed; therapy and medications were not sufficient. Regan made continuous threats; was unable to use her coping skills; exhibited poor frustration tolerance; and had difficulties with anger management. Even in a structured setting such as Metropolitan, Regan had "episodes" and was illicitly using other patients' medications. Despite all the care Regan was receiving in Metropolitan, Regan was still exhibiting symptoms and had not completed a relapse prevention plan. If released into the community, Regan would pose a great problem. She would not have access to intramuscular emergency medication; frequent medication adjustments might not occur; there would be less therapy.

Regan testified on her own behalf. Regan claimed that when she was committing crimes, she was not receiving mental health treatment. She acknowledged having a razor blade while incarcerated, the section 4502 offense, but claimed she wanted it to kill herself. She claimed she had another patient's Ativan because the patient gave it to her; she took another patient's medication because she had back pain and claimed the hospital would not help her.

Regan testified she had relapse prevention plans for mental illness, violence, and substance abuse. Regan's postrelease plan included staying in a 28-day homeless shelter; getting her social security reinstated; and then making arrangements to go to Upland where there was a program for people with substance abuse and mental health problems. She also had a friend that would help her get a job in a pet shelter. Regan testified that she would seek help from local mental health clinics. She claimed she no longer was violent as a result of the treatment she had received.

5.

According to Regan, she never threatened to hit people if she did not get emergency medications; the nurses were lying when they claimed she had made threats. Regan claimed she needed emergency medication because of the behavior of the other patients. Regan claimed she would be less agitated if she was not in a state hospital.

On January 8, 2015, the jury found Regan posed a substantial danger of physical harm to others as a result of mental disease, defect, or disorder. The trial court ordered Regan's commitment extended for another two years, to February 6, 2017. Regan filed a timely notice of appeal.

## **DISCUSSION**

Regan contends that substantial evidence did not support the order for extension of her commitment. Specifically, she contends the evidence failed to show she currently presents a substantial danger of physical harm to others; or that she suffers from a volitional impairment rendering her dangerous beyond her control.

### *Standard of Review*

Section 1026.5, subdivision (b)(1) provides in part that a person is subject to an extension of his or her commitment if "the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." This last element requires that the person have serious difficulty controlling his dangerous behavior. (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159.)

Whether the People proved their case is a question of fact for the jury to resolve with expert testimony. (*People v. Superior Court (Blakely)* (1997) 60 Cal.App.4th 202, 204-205, 215.) When a defendant challenges the evidence supporting a section 1026.5 extension of commitment, we apply the test used to review a judgment of conviction; that is, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5, subdivision (b) beyond a reasonable doubt. (*People v. Crosswhite* (2002) 101

6.

Cal.App.4th 494, 507-508.)  A single psychiatric opinion can support a verdict.  (*People v. Superior Court (Williams)* (1991) 233 Cal.App.3d 477, 490.)

### Substantial Danger of Physical Harm

Regan contends the evidence does not establish that she presents a danger of physical harm to others if released into the community.  On the contrary, there is abundant evidence that Regan presents such a danger.

Two medical professionals testified that Regan's mental disorders made her dangerous to others if released.  Johnson noted that even in a controlled environment such as Metropolitan, Regan physically attacked another patient who was in restraints.  Regan was sensitive to loud noises and other patients could trigger an angry response from her.  Johnson "can't count how many times [Regan] has made statements of violence" in order to obtain emergency medication.  Johnson testified that Regan should not be released into the community due to a combination of factors including mental illness, craving for substances, violent tendencies, and verbalization of threats.  Johnson opined that if released into the community, Regan would be at great risk of hurting other people.

Rim had seen Regan exhibit poor frustration tolerance, difficulties with anger management, and poor relationships, all indicative of borderline personality disorder.  Regan's disregard for the rules of the unit where she was housed and the use of illicit substances by obtaining them from other patients were indicative of antisocial personality disorder.

According to Rim, Regan was too dangerous to be released into the community, because her symptoms and behaviors were not being managed; therapy and medications were not sufficient.  Regan made continuous threats; was unable to use her coping skills; exhibited poor frustration tolerance; and had difficulties with anger management.  Even in a structured setting such as Metropolitan, Regan had "episodes" and was illicitly using other patients' medications.

Despite all the care Regan was receiving in Metropolitan, Rim stated that Regan was still exhibiting symptoms and had not completed a relapse prevention plan. If released into the community, Regan would pose a great problem. She would not have access to intramuscular emergency medication; frequent medication adjustments might not occur; there would be less therapy.

In sum, the evidence demonstrated that after years of treatment, Regan remained oppositional to staff in that she failed to follow rules of the unit; threatened staff to get additional medication; took medication from other patients for her own use; assaulted another patient who was restrained; and was angered by loud noises and had difficulty controlling her anger. There was no credible evidence that Regan would be able to manage the manifestations of her mental illnesses outside a hospital setting; she was unable to manage them in a controlled setting. Both Rim and Johnson testified Regan posed a danger to others if released into the community. This evidence combined is more than sufficient evidence from which a reasonable trier of fact could find that Regan posed a substantial danger of physical harm to others if released into the community. (*People v. Williams* (2015) 242 Cal.App.4th 861, 873-875.)

### *Volitional Control*

Regan contends the evidence does not show that she suffers from a volitional impairment rendering her dangerous beyond her control. Again, there is sufficient evidence of this element.

An extension of a commitment order requires evidence that the person has "serious difficulty in controlling dangerous behavior." (*In re Howard N.* (2005) 35 Cal.4th 117, 132.) There is ample evidence of a lack of volitional control.

Regan lacked insight into her illness; suffered from substance abuse issues and was illicitly using other patients' medication; she was violent even while hospitalized and being treated, in that she attacked another patient and threatened nurses; she relied on

8.

medications, including emergency medications; she failed to follow treatment plans; and lacked stability of symptoms.

Regan was sensitive to loud noises and other patients could trigger an angry response from her. Regan had a history of sabotaging her own treatment. Regan had told nurses she cannot use coping skills; she just wants medication. Johnson testified Regan's bipolar disorder included depression, suicidal ideation, mania, and a history of irritability which can lead to aggressive thoughts, which had "been characterizing her more recently within the past year."

According to Rim, despite the hospital environment and medication, Regan's symptoms and behaviors were not being managed; therapy and medications were not sufficient to control the behaviors and symptoms. Regan made continuous threats; was unable to use her coping skills; exhibited poor frustration tolerance; and had difficulties with anger management. Even in a structured setting such as Metropolitan, Regan had "episodes." Despite all the care Regan was receiving in Metropolitan, Regan was still exhibiting symptoms and had not completed a relapse prevention plan.

This evidence demonstrates that despite treatment and medication, Regan was unstable and unable to control the symptoms and behaviors associated with her mental illness. (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879.)

## DISPOSITION

The January 14, 2015, order for extended civil commitment to a state hospital pursuant to Penal Code section 1026.5 is affirmed.

9.