Filed 3/22/21  P. v. Gram CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C091437 |
| Plaintiff and Respondent, | (Super. Ct. No. 94F10155) |
| v. | |
| CAREY LEWAN GRAM, | |
| Defendant and Appellant. | |

Following a bench trial, the trial court renewed defendant Carey Lewan Gram's mentally disordered offender (MDO) status and involuntarily committed him for an additional year.  (Pen. Code, §§ 2972, 2972.1, statutory section references that follow are to the Penal Code unless otherwise stated.)  Defendant appeals, arguing the renewal of this status is not supported by substantial evidence.  We affirm the trial court's order of commitment.

1

FACTS AND PROCEDURAL HISTORY

In 1995, defendant was convicted of felony assault with a deadly weapon (§ 245) after he broke into his elderly neighbor's apartment and hit her with a stick several times while she was in the bathtub. The trial court sentenced him to four years in prison. After defendant was paroled in 1998, he was involuntarily committed to the Department of Mental Health as an MDO, pursuant to section 2692. Defendant stayed in a mental hospital until January 2000, when he was released to the Conditional Release Program. However, he failed to meet the required conditions and was hospitalized again pursuant to section 2964. His commitment was extended multiple times. While hospitalized, defendant's behavior became increasingly manipulative, inappropriately sexual, and violent. In January 2006, the Department Review Board approved defendant for transfer back to the California Department of Corrections and Rehabilitation due to his consistently problematic behavior and increase in paranoia. He was incarcerated in state prison until 2018, when he was transferred back to the state hospital pursuant to section 2972, where he has since remained.

In 2019, the People filed a petition (§§ 2970, 2972) to extend defendant's involuntary commitment from January 2020 to January 2021. Defendant waived his right to a jury trial and the petition proceeded as a bench trial. Dr. Roxanne Rassti, a forensic psychologist at defendant's hospital who conducts yearly evaluations of MDO patients to assess their possible recommitment, testified on behalf of the prosecution. Dr. Rassti's testimony relied upon defendant's criminal record, commitment records and medical file, which included his prior forensic evaluation, treatment plans and notes, and progress reports. She further relied on her interview with defendant and consultation with his current treatment providers. She testified defendant suffered from schizoaffective disorder, bipolar type, which combines both psychotic symptoms and mood symptoms. His symptoms included auditory hallucinations, delusional ideation, paranoia, thought

2

disorganization, and hypomanic or manic episodes, which consisted of irritability, extreme mood swings, decreased need for sleep, increases in energy, and hyper-sexuality.

Dr. Rassti testified that medication has helped but has not resolved defendant's symptoms entirely, and that defendant's mental illness was not in remission. She opined that continued treatment at the hospital was necessary to maintain any progress he had made. Her opinion was based on defendant's overt symptoms of his mental disorder, as well as 10 stipulated interdisciplinary notes from March and April of 2019. The notes included an instance of masturbating to a staff member, several instances reflecting defendant's persistent delusional belief that he would be imminently discharged, and multiple instances of defendant's paranoia, hostility, and verbal threats towards staff and patients, including saying to a patient, "I ain't no child molester, you a rapist," and to another patient, "what are you looking at, you fucking faggot?"

Dr. Rassti further opined that defendant represented a substantial risk of physical harm to others because of his severe mental disorder. In support of her opinion, Dr. Rassti cited to defendant's history of physical and verbal aggression related to his mental disorder. She specifically referenced his commitment offense from 1995, when he assaulted an elderly woman in a bathtub, and his 1984 sexual assault with a deadly weapon on a driver after a car accident, for which he was found not guilty by reason of insanity. Dr. Rassti also noted his 28 rule violation reports during his recent incarceration, as well as several incidents of violence at the hospital since 2018, and several acts of verbal aggression in 2019, which she believed were aggravated by his severe mental disorder.

She testified that although defendant acknowledged he had a mental illness, he qualified his statement with, "but I don't think that I'm really crazy." She said he "continued to deny really thinking that he has a mental illness." She also expressed concern that he would stop taking his psychiatric medication once released, because he said he wanted to decrease his medication. Defendant's lack of insight into his mental

3

illness, and his high risk for discontinuing medication upon release, which could then cause his psychological condition to deteriorate and increase his risk for violent behavior, constituted Dr. Rassti's "biggest concern" regarding whether he would pose a substantial danger.

Defendant's treating psychiatrist, Dr. Suresh Bangara, also testified on behalf of the prosecution. He stated that defendant was on two antipsychotic medications and described him as medication compliant, though he noted that defendant, like approximately half of the hospital's patients, is observed for 20 minutes after he takes his medication to ensure he does not spit it out.

Defendant testified on his own behalf. He acknowledged he had a mental illness, correctly named his medications, and stated they keep him "in check." He said he was ready to leave the hospital as he had been participating in treatment and groups and getting along with others. Defendant's sister also testified, stating that she would house and care for defendant if he was released.

The court found the prosecution proved the requirements of section 2970, subdivision (b) beyond a reasonable doubt, and extended defendant's commitment for one year. Specifically, the court found that defendant had a severe mental disorder, schizoaffective disorder with bipolar type attachment. It further found defendant's severe mental disorder was not in remission, and if it were in remission, it could not be kept in remission without consistent treatment and progress. And finally, the court found that because of defendant's severe mental disorder, defendant represented a substantial danger of physical harm to others. The court based this conclusion on defendant's history of violence and his ongoing evidence of conflict during treatment over the last year. Defendant timely appeals.

4

DISCUSSION

Defendant argues the trial court's finding that defendant represented a substantial danger of physical harm due to his mental illness was not supported by substantial evidence. He specifically contends the trial court should have disregarded Dr. Rassti's testimony as unreasonable because she based her opinion that defendant was a substantial danger to others on speculation and conjecture. We find substantial evidence supports the trial court's findings.

"The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission. ([]§ 2960 et seq.) Although the nature of an offender's past criminal conduct is one of the criteria for treatment as a mentally disordered offender (MDO), the MDO Act itself is not punitive or penal in nature. [Citation.] Rather, the purpose of the scheme is to provide MDO's with treatment while at the same time protecting the general public from the danger to society posed by an offender with a mental disorder. ([]§ 2960.)" (*In re Qawi* (2004) 32 Cal.4th 1, 9.)

" 'The MDO Act establishes a comprehensive scheme for treating prisoners who have severe mental disorders that were a cause or aggravating factor in the commission of the crime for which they were imprisoned. (See § 2960.) The act addresses treatment in three contexts—first, as a condition of parole (§ 2962); then, as continued treatment for one year upon termination of parole (§ 2970); and finally, as an additional year of treatment after expiration of the original, or previous, one-year commitment (§ 2972).' [Citation.]" (*People v. Cobb* (2010) 48 Cal.4th 243, 251.) "Commitment as an MDO is not indefinite; instead, '[a]n MDO is committed for . . . one-year period[s] and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or

5

she should be recommitted for another year.' " (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1063, disapproved on other grounds in *People v. Harrison* (2013) 57 Cal.4th 1211, 1230.)

Section 2972, subdivision (c) requires a determination of three questions: "Does the defendant continue to have a severe mental disorder? Is the disorder in remission? Does the defendant continue to represent a substantial danger of physical harm to others?" (*People v. Cobb, supra*, 48 Cal.4th at p. 252 [citing § 2972, subd. (c)].) "A defendant's condition a year earlier is relevant but not dispositive of these questions." (*Cobb,* at p. 252.) Based upon the answers to the foregoing questions, the court thereafter determines whether the MDO patient should be discharged, recommitted to the patient's current facility, reapproved for outpatient status if the patient is in outpatient treatment, or committed to a state hospital if the patient was in prison. (§ 2972, subd. (c).)

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding. [Citation.] ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder . . . .' [Citation.]" ' [Citations.]" (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)

We find substantial evidence supports the trial court's finding that defendant represented a substantial danger of physical harm to others. (§ 2972, subd. (c).) At the outset, we note the court may rely on expert testimony to make its decision. (*People v.*

6

*Williams* (2015) 242 Cal.App.4th 861, 872 ["A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment"].) While defendant argues Dr. Rassti spoke in generalities and failed to base her opinion on statistics, controlled studies, treaties, or articles, Dr. Rassti was not restricted to one methodology or another. (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155 [expert may base his or her opinions on, for example, observations of and statements made by the patient].) Indeed, "[n]o precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior." (*Id.* at p. 1154.) Instead the trial court could make its own judgment about the qualifications of Dr. Rassti, her credibility, and the value of her opinions.

Further, contrary to defendant's assertion, the court need not limit its considerations to evidence of defendant's actions from the past year. When assessing a defendant's risk of physical harm to others, a mental health professional "should take into account the prisoner's entire history . . . this includes prior violent offenses as well as the prisoner's mental health history." (*People v. Pace* (1994) 27 Cal.App.4th 795, 799.)

Here, Dr. Rassti opined that as a result of defendant's severe mental disorder, defendant represented a substantial risk of physical harm to others. She based her opinion on defendant's records and treatment documentation, as well as her personal interactions with defendant and discussions with his treatment team. Dr. Rassti considered "well-established predictors of violent recidivism," including defendant's prior commitment and incarceration for two violent assaults, as well as his numerous incidents of violence and rule violations while in the hospital and while incarcerated. She further referenced two acts of verbal aggression from 2019. She testified that during each incident of violence or aggression, he was experiencing psychiatric symptoms that aggravated or caused those incidents. Defendant's limited insight into his mental illness and need for medication, and his desire to decrease his medication, additionally supported her opinion. Thus, Dr. Rassti's testimony provided substantial evidence on which the

trial court could base its finding that defendant represented a substantial risk of physical harm to others due to his mental disorder.

Finally, while defendant argues that Dr. Rassti did not take defendant's sister's testimony into account when forming her opinion, Dr. Rassti was not required to do so. Rather, the trial court was able to hear both Dr. Rassti's and defendant's sister's testimony and make its decision accordingly. On substantial evidence review, we must defer to the trial court's evaluation of the value and credibility of witness testimony.

DISPOSITION

The judgment is affirmed.

_____
HULL, J.

We concur:

_____
BLEASE, Acting P. J.

_____
MURRAY, J.

8