Filed 2/1/22  P. Fekadu CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078696 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD109580) |
| BERHU HADARA FEKADU, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Peter L. Gallagher, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Berhu Hadara Fekadu was committed to the California Department of State Hospitals in 1996 pursuant to Penal Code section 1026[1] after he was found not guilty by reason of insanity (NGI) of several criminal charges in 1995. He appeals an order extending his commitment for an additional two years—until October 3, 2022—pursuant to section 1026.5. Fekadu contends that there was no substantial evidence to support the trial court's finding that he would pose a risk of danger to others if released. We disagree and affirm the order.

## BACKGROUND

### A. *Commitment History*

On December 31, 1994, Fekadu approached two 13-year-old girls who were standing outside of a restaurant. He grabbed one girl from behind, fondled her breasts, stomach and neck, and asked for a kiss. When the first victim pushed him away, he approached the second girl. He tried to kiss her, grabbed her from behind, and groped her breasts. When the girls ran inside the restaurant, Fekadu followed. The mother of one of the girls picked up a knife and told Fekadu to leave. Fekadu, who also had a knife, held it over his head and screamed, " 'Don't come close to me. I'm God.' " The girls and the mother escaped and locked themselves in an office.

A jury found Fekadu NGI in December 1995 of two counts of lewd acts upon a child under the age of 14 (§ 288, subd. (b)) and three counts of assault with a deadly weapon likely to cause great bodily injury (§ 245, subd. (a)(1)). The trial court thereafter found that Fekadu had not recovered his sanity and committed him in 1996 to the State Department of Mental Health for treatment. His maximum term of commitment was set at six years and 10

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

2

months, including only periods of actual confinement.  Fekadu was released under the conditional release program (CONREP) for community-based treatment in 1998, but was recommitted in 1999 after he ceased taking his psychotropic medication and decompensated.  His commitment was subsequently extended eight times pursuant to section 1026.5.

B.    *Current Petition for Recommitment*

At the request of the medical director for the state hospital where Fekadu is currently committed, the People petitioned in June 2020 to again extend Fekadu's commitment, which was scheduled to expire on October 3, 2020.  The medical director declared that Fekadu qualified for an extension of his commitment because he represents a substantial danger of physical harm to others by reason of his mental disease or disorder.

The recommitment trial was delayed until 2021 due to issues related to the COVID-19 pandemic.  Three experts testified at the bench trial.  Fekadu testified on his own behalf.

1.    *Testimony of Dr. Ana Kodzic*

Dr. Kodzic is a forensic psychologist at the hospital where Fekadu is committed.  She has evaluated Fekadu every six months since 2017.  She is not part of his treatment team, but prepares reports approximately every two years regarding whether an extension of his NGI commitment is necessary.

Fekadu is diagnosed with schizophrenia and he has presented symptoms consistent with that diagnosis in his interviews with Dr. Kodzic.  He has had auditory hallucinations, grandiose delusions, paranoid delusions, and disorganized behavior since at least 1994.  Fekadu has admitted that he committed the 1994 NGI crime of touching a girl because voices told him to do so.

3

In a February 2019 evaluation, Fekadu's mental illness appeared to have become destabilized from his baseline, which Dr. Kodzic described as already "fairly symptomatic." His delusions were more grandiose and prominent. He spoke about being persecuted and kidnapped by Italian missionaries and "colonizers." He claimed to be the prime minister of Ethiopia and that evil entities were preventing him from performing that role. He stated that when he writes letters to people, they become doctors. He also talked about having great mastery of the Bible. Dr. Kodzic described his writings as disorganized. Fekadu quoted Biblical passages, but did not put them together in a way that made sense.

About four months later, in June 2019, Dr. Kodzic interviewed Fekadu with his treatment team because Fekadu was very symptomatic with grandiose delusions. He talked about being an international politician, said that he could be a doctor, and claimed to be a miraculous healer who could heal doctors. He used made-up words, referred to as neologisms, which is a classic symptom of schizophrenia. He was agitated and emotional. Dr. Kodzic described him as "hyperverbal and hyperreligious." Fekadu told his treatment team that " 'sooner or later doctors get punished and end up in graves.' " Earlier, Fekadu had handed his psychiatrist a letter that said, "God will smite you down" and "you are a liar and God hates liars." Fekadu gave Dr. Kodzic a similar letter that was disorganized and menacing in tone.

Fekadu has never been able to discuss how his mental illness is connected to his NGI offenses or how it relates to his propensity to commit violent or sexual offenses. At times, he maintains that he is innocent, the charges are fabricated, and he is being held illegally. Other times, he says that he touched a lady because voices told him to do so. He also says that a doctor told him to plead NGI because he would be hospitalized for only six

months. He has never been able to successfully participate in sex offender treatment because he has not had the ability to recognize risk factors for sexual aggression or discuss such topics in a logical manner.

Dr. Kodzic met with Fekadu in March 2020 for the most recent recommitment evaluation. Fekadu was still symptomatic and did not display appropriate insight into his mental illness. He exhibited grandiose and paranoid delusions. His thought organization was tangential and difficult to redirect, but was not disorganized. He would become so fixated on his delusions that it was difficult to redirect him to discuss the questions asked. He talked about being prevented from assuming his role as a prime minister of Ethiopia. He was overly focused on the sexuality of his peers and expressed fear that homosexual peers were going to sexually assault him, without any basis in fact. He perseverated on Italian and Catholic colonizers whom he said had somehow worked against him and his family. He remained hyperreligious and had grandiose ideas about God and how he fits within God's plan. Fekadu maintained that he no longer had schizophrenia, that he had been "restored," and that he no longer needed medication for either schizophrenia or for his medical conditions such as hypertension and allergies.

Dr. Kodzic opined that Fekadu was "floridly psychotic" at the time he committed his NGI offenses. According to Dr. Kodzic, insight into his mental illness, such as recognizing that he has a chronic illness that does not go away and that medication compliance is necessary, is an important factor to keep his symptoms in check and to prevent him from harming himself or others.

When Dr. Kodzic evaluated Fekadu again in January 2021, he showed marginal improvement. He was not as agitated or paranoid as he was at the

time of the prior evaluation. He had similar delusions and was religiously preoccupied, but his symptoms were toned down. He still did not have appropriate insight into his mental illness and did not acknowledge positive aspects of adhering to medication management. He adamantly asserted, " 'I don't need psychiatric medication. It's breaking and killing me.' " Fekadu has been prescribed several different medications for his schizophrenia with varying degrees of success. He has a history of medication noncompliance and intermittently asks to be taken off his medications, including those for his medical conditions. Dr. Kodzic noted that Fekadu's refusal to take medication for high blood pressure and diabetes is concerning because these conditions can lead to significant medical complications.

Dr. Kodzic stated that Fekadu works against his treatment team and is not forthcoming about his symptoms. For example, Fekadu told a staff member in 2018 that he was hearing the voice of an evil woman, but he did not want to tell his doctors because he thought they would increase his medications. He previously assaulted a psychiatrist, which resulted in his transfer to his current facility. The recent letter to his psychiatrist was threatening in that it said that God would punish the psychiatrist. Dr. Kodzic indicated that Fekadu's belief that he is the hand of God raises the concern that Fekadu would act aggressively in the future, particularly if he heard a voice that he believed to be God's.

Fekadu engaged in violent acts in 1995, 2011, 2014, 2015, and 2017. He also behaved in a sexually inappropriate manner toward his psychologist and had a few indecent exposure incidents in 2015. Dr. Kodzic took these

6

incidents into account in her evaluation of whether Fekadu could control his dangerous behavior if released.[2]

In Dr. Kodzic's opinion, Fekadu's mental disorder is not in remission and he represents a danger of physical harm to others. She explained that even in a highly controlled hospital environment where he is on psychotropic medications, he has a hard time managing his behavior effectively. Although he has not engaged in physical altercations or acted out sexually in some time, he recently wrote threatening letters to his care providers. He continues to be delusional and said that he would stop taking his psychotropic medications if released. He believes that he can use coping skills such as reading the Bible, journaling, and praying to ensure that he does not harm others.[3]

Fekadu's discharge plans are not reasonable. He plans to return to Ethiopia and become a prime minister to "bring theocracy and democracy to Ethiopia." He has no support in the community and has had no recent contact with family members.

Given how symptomatic Fekadu is in a controlled environment, Dr. Kodzic believed that he would decompensate under his paranoid and

---

[2]    On cross-examination, Dr. Kodzic discussed an incident that occurred in June 2017 when Fekadu had physical contact with another patient. Dr. Kodzic acknowledged that if another patient initiated physical contact, it would be reasonable for Fekadu to defend himself.

[3]    Fekadu does sing, pray, and write to self-soothe when he feels agitated. However, Dr. Kodzic thought that his statements about using those strategies as coping mechanisms is a learned response and not a true expression of how he could use such skills to manage his psychiatric symptoms if released. He does not understand his symptomology or the need to cope. Because he does not think that he has a mental illness, he does not use appropriate coping skills to manage that illness.

grandiose delusions if he were released to the community and stopped taking his medications, as he indicated he would do.  She believed that Fekadu's auditory hallucinations would reemerge and that his inhibitions would be lowered without medications.  This would place him at increased risk of engaging in aggressive behavior, committing another crime, and harming himself or others.  In Dr. Kodzic's opinion, Fekadu meets the criteria for recommitment.

2.      *Testimony of Dr. Nicole Friedman*

Dr. Friedman, a court-appointed psychologist, evaluated Fekadu in 2020 and reviewed his records from CONREP, the state hospital, and his criminal record history.  She previously evaluated Fekadu in 2014.  She relied on both her evaluation and his records to form her opinions.

Fekadu exhibited delusions, including grandiose delusions, and agitation during Dr. Friedman's 2020 evaluation.  He lacked insight into his mental illness.  He did not believe that he has a mental illness or that he needs medications.

Fekadu acknowledged that he is being treated for schizophrenia and delusions and understood that he is required to take medications pursuant to an involuntary medication order.  However, he disagrees that he has a mental illness and does not think that medications are helpful.  He believes that he has been mistreated while in a hospital setting and that his treatment has been abusive.  He said that he has faith in a higher power and that he uses prayer, meditation, and journaling to heal himself.  He takes his psychotropic medication under the involuntary medication order.  However, he has asked to change his dosage because he believes that he was being poisoned.  He has refused his medications for medical conditions such as

8

diabetes and hypertension. Dr. Friedman believed that Fekadu would not take his psychotropic medications without an involuntary medication order.

Fekadu's thought process was coherent and logical at one point in the interview but later became disorganized, convoluted, and tangential. His discharge plans initially sounded reasonable; he wanted to return to his family in his country of origin. However, other portions of his plan sounded delusional. He said that his family was caged, that they can come back to life, and that his mother was waiting for him in a cage on their property. He went onto say that he is a prophet who has been studying the Bible for over 20 years. Later, he said that he thought perhaps he could transfer to a different level of care, which sounded less delusional.

Dr. Friedman opined that Fekadu has active symptoms of schizophrenia, which is a chronic and severe mental illness, and that his illness is not controlled by his psychotropic medications. Fekadu does not understand his commitment offenses or the role that his mental illness played in those offenses. As a result, he has difficulty controlling his dangerous behavior.

Dr. Friedman agreed that Fekadu had not exhibited physical aggression or increased anxiety in the last two years to the extent that he required additional medication that is prescribed for use on an as-needed basis to control symptoms that are not sufficiently controlled by the patient's usual medications. She agreed that he is at low risk for dangerous behavior to others while in a controlled institutional setting where his mental illness is well cared for. However, Fekadu's writings reflect aggressive thoughts, which could be a warning sign of later physical violence.

In Dr. Friedman's opinion, Fekadu lacks insight and is unable to manage his mental illness with psychosocial support, his own awareness,

9

coping skills, or the use of medication. He was not able to provide an appropriate discharge plan for himself. His lack of insight about his mental disease is concerning because it hinders his ability to care for himself by participating in treatment or trusting someone of authority who tells him that his mental disease is affecting his perception of reality.

Dr. Friedman believed that Fekadu's delusions put him at an increased risk of posing a danger to others because he is not in touch with reality, his disorder is not in remission, and his criminal history shows that his mental illness can cause him to behave in an aggressive manner and to act inappropriately. The fact that Fekadu is on an involuntary medication order shows that he does not consistently demonstrate the ability or motivation to take his psychotropic medications, which help abate his symptoms. If he were released, Dr. Friedman believed that it was unlikely that he would take his medications or seek proper treatment for his mental disorder, and that he would decompensate without such treatment. She believed that he should be recommitted.

3. *Testimony of Dr. G. Preston Sims*

Dr. Sims is a clinical and forensic psychologist and a sexually violent predator evaluator for the Department of State Hospitals. He evaluated Fekadu in November 2020, reviewed Fekadu's records from October 2018 to January 2021, and also reviewed his criminal record.

Although Fekadu was cooperative during the evaluation, his speech was disorganized, he changed subjects frequently, and it was difficult to follow his logic. He made bizarre statements, including that he talks to his children telepathically. Dr. Sims believed that this was current evidence of auditory hallucinations. Fekadu also showed symptoms of persecutory, grandiose, and religious delusions.

10

Fekadu did not display insight into his mental illness. He denied being mentally ill. He said that he has been wrongfully held at the state hospital, does not need medication, and that the hospital staff are trying to poison or kill him. Fekadu made contradictory statements, saying that he disagreed that he has delusions and then saying, "I had delusions, but they're in remission."

Dr. Sims believed that Fekadu meets the criteria for an extension of his NGI commitment. He agreed with Fekadu's diagnosis of schizophrenia, which is a severe mental disorder. The condition is not in remission.

Dr. Sims stated that psychological literature correlates insight with the risk of future violence. When patients understand their mental illness, their treatment goes more smoothly. They take their medication, they are more likely to attend group therapy, and their daily interactions are easier.

Fekadu did not demonstrate an understanding of the role his mental illness played in his NGI offense. He said that only one female was involved and that he touched her breasts as she was running. He denied having a knife. He claimed that the police had made a false report and said that he was suing them for $50 million.

Dr. Sims believed that Fekadu represents a substantial danger of physical harm to others. In forming this opinion, he evaluated Fekadu with a widely-recognized risk assessment tool known as the Historical Clinical Risk Management 20 (HCR-20). This actuarial risk assessment tool rates an individual on 20 factors "that the psychological literature has shown to correlate with violent recidivism." These include historical, clinical, and future risk factors. Fekadu had 12 out of 20 factors, indicating that he is at high risk for engaging in future violence.

Fekadu had three of 10 historical risk factors. These include engaging in violence, suffering from a major mental disorder, and having problems with treatment or supervision response. The persecutory delusions caused by his mental disorder, in particular, place him at an increased risk of engaging in violent behavior.

Fekadu had four of five clinical factors placing him at risk of future violence. These include a lack of understanding about why his medications are necessary to treat a mental illness, recent symptoms including persecutory delusions, and problems with instability, meaning a lack of consistent emotional expression across time. He becomes argumentative and defensive and sometimes does not respond well when contacted by staff members. The fourth factor is his involuntary medication order and his recent refusal to take his medications.

Dr. Sims also believed that Fekadu had all five future risk factors for violence. These include future problems with cooperating with professional services and plans, difficulty living in an unstructured environment, lack of family support, future problems with treatment, and future problems with stress or coping.

Even without considering the results from the assessment tool, Dr. Sims believed that Fekadu posed a danger to others in the community in view of his denial of his diagnosis and symptoms, his belief that he does not need medications, and his history of becoming aggressive with little provocation. Based on Fekadu's history of aggressive behavior, Dr. Sims believed that Fekadu would have serious difficulty controlling his dangerous behavior if he were to be released and were not medicated. Dr. Sims thought that it was significant that most of the incidents of aggressive behavior had occurred while Fekadu was in custody or in a state hospital setting

12

undergoing treatment and receiving medication. Dr. Sims did not believe that Fekadu would take his psychotropic medications in an unstructured setting, which would further contribute to his serious difficulty in controlling his dangerous behavior. Dr. Sims noted that the incidents of aggressive behavior occurred when Fekadu misperceived someone as behaving aggressively toward him and would react with aggression.

Dr. Sims was of the view that Fekadu should be recommitted because he has a severe mental disorder, he represents a substantial danger to others by reason of this mental disorder, and he has serious difficulty controlling his dangerous behavior.

4. *Testimony of Fekadu*

Fekadu testified that he believed he was ready for release from the hospital. He stated that there were four churches where he could go for help and that he also has family members who would be available to transport him from the hospital to one of the four churches in San Diego. He believed that he could go to the church where he was baptized and that they would provide him with a room and food. He said that he could finish a computer degree and then become a professor at San Diego City College. Thereafter, he planned to go to Ethiopia.

Fekadu said that he would not seek psychiatric treatment and would not take psychiatric medication if released. He stated, "[A]ll I need is church." He said that he will need to use his coping skills "forever," to handle stress or frustration and described his coping skills as prayers, meditation, reading, writing, journaling, exercising, phoning, watching television, and listening to music. If he were to experience agitation in public, he would kneel down and pray or go home to pray for God's peace. Writing down his frustrations would also help. He maintained that he would not act out.

13

Although he initially said that he had learned these skills from hospital classes, he later said that he had come up with most of them himself.

Fekadu explained that he does not want to take medications because they cause physical side effects. He believes that the medications have impaired his eyesight and that they cause swelling, vomiting, constipation, and tremors in his hands.

Fekadu testified that only psychiatrists frustrate him. He denied that he would harm a psychiatrist, but believed that God would do so based on Bible passages. He believes that the passages indicate that he has the divine power of the Holy Spirit and that he is a prophet. He said that when people "go against prophets . . . they will die." He denied that he has a mental illness saying, "If I say I have mental illness, it's a disgrace to the almighty and intelligence–infinite intelligence of God."

5.    *Court's Ruling*

After considering the evidence, the court concluded that Fekadu met the criteria for recommitment for two additional years. Based on the opinions of the experts as well as Fekadu's testimony that he would not take his psychotropic medications if released, the court determined that he has a serious, severe mental disorder and that he poses a substantial danger of physical harm to others by reason of that disorder because he has serious difficulty controlling his dangerous behaviors.

DISCUSSION

A.    *General Legal Principles*

A defendant who is found NGI may be confined to a state psychiatric hospital for a period as long as the maximum amount of time for which the defendant could have been imprisoned if he or she had been found guilty of the charged offense(s). (§§ 1026, 1026.5, subd. (a)(1).) However, the district

14

attorney may petition the superior court to extend the commitment of a patient if the patient represents a substantial risk of physical harm to others because of a mental disease, defect, or disorder. (§ 1026.5, subd. (b)(2).)

Establishing that an NGI defendant poses a substantial danger of physical harm to others "requires proof that the person has serious difficulty controlling his dangerous behavior." (*People v. Williams* (2015) 242 Cal.App.4th 861, 872 (*Williams*).) The factors required for an extended commitment must be proven beyond a reasonable doubt. (*Ibid.*; see § 1026.5, subd. (b)(7).)

The person may defend against the extension by proving by a preponderance of evidence that medication effectively controls his mental illness and that he will take his medication without fail in a completely unsupervised environment. (*People v. Bolden* (1990) 217 Cal.App.3d 1591, 1602 (*Bolden*).)

"We review an order to extend commitment under section 1026.5 by applying the substantial evidence test, examining the entire record in the light most favorable to the order to determine whether a rational trier of fact could have found the requirements of the statute satisfied beyond a reasonable doubt. (*Williams*, *supra*, 242 Cal.App.4th at p. 872.)

B.    *Application*

Fekadu admits that he was still experiencing symptoms of schizophrenia at the time of the recommitment hearing, but contends that the court lacked substantial evidence to find that he presented a danger to himself or others because he had not acted out physically since 2016.

Although Fekadu has not acted out recently, he did engage in an altercation, either by mutual combat or as self-defense, in 2017 and he has written threatening and menacing letters since that time. We conclude that

there is other substantial evidence to support the court's determination that Fekadu represented a substantial danger to others.

The court considered, and was entitled to rely upon, the testimony of the three psychologists, including the results of the risk assessment tool used by Dr. Sims. (*Williams*, *supra*, 242 Cal.App.4th at p. 872 ["A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment."].) Each expressed the opinion that Fekadu would pose a substantial danger to others if released. They based their opinions not simply on his NGI offenses or past aggressive behavior, but also on his complete lack of insight into his mental illness and his stated intention to stop taking his prescribed psychotropic medications if released. Fekadu confirmed in his testimony that he does not believe that he has a mental illness and that he would not take medication if released.

The court noted that Fekadu becomes irritable when chastised, he is paranoid about the intentions of others, he verbalizes antisocial intent toward others of different ethnicities or gender, and he has engaged in instances of dangerous behavior even in an institutional setting as recently as 2017. Dr. Friedman said that Fekadu's illness can cause him to act aggressively or make threats of revenge or retaliation toward his treatment team based on persecutory ideas. Dr. Sims stated that Fekadu becomes argumentative and defensive when contacted by staff members.

Dr. Kodzic and Dr. Sims both commented that Fekadu's NGI crimes were driven by command auditory hallucinations. Without medications to manage those auditory hallucinations or "voices," they would become more prominent and would compound Fekadu's persecutorial and grandiose

16

delusions, which would increase the risk of aggression, particularly if he believed that he was hearing the voice of God.

Without insight into his mental illness and continued use of medication in a controlled setting, all three experts believed that Fekadu would decompensate psychologically to the point that he would have difficulty controlling behavior that is dangerous to others, particularly when faced with environmental stressors. All three experts believed that Fekadu would pose a substantial risk of danger to others if released.

These are not speculative opinions, as Fekadu suggests. These are opinions based on the experience and training of the psychologists and are grounded in fact, based on Fekadu's statements and his documented mental health history. "In the context of a petition for an extension of commitment under section 1026.5, subdivision (b), a finding on whether the individual is dangerous to others because of mental illness is essential. Testimony by mental health experts in this context will often be the only way to establish whether such dangerousness exists." (*People v. Bennett* (1982) 131 Cal.App.3d 488, 497.) "A mental health professional's opinion on an individual's dangerousness 'includes a significant contemporary component. It speaks . . . to the *present* proclivities of the individual; it says that he is at this moment fully *capable* of conduct dangerous to the health and safety of others . . . .' " (*Ibid.*) Mental health professionals "are routinely called upon to make assessments of present dangerousness," as they were here.[4]

*People v. Esparza* (2015) 242 Cal.App.4th 726, cited by Fekadu, does not assist him. That case involved a denial of a request for resentencing as a second strike offender under section 1170.126 because the trial court was not

_____

[4]     Fekadu has not challenged the qualifications of the experts to make these determinations, either at trial or on appeal.

willing to determine that the defendant did not pose a danger to the community. (*Id.* at pp. 732–734.) Although the court commented that the defendant's prison record was " 'the most stellar' the court had seen," the court was concerned about the defendant's lengthy criminal history, which involved numerous convictions for driving under the influence, and inferred that the defendant's commitment to Alcoholics Anonymous meetings was insincere because he had been in prison for 16 years and had only recently started attending meetings after a change in the law. (*Id.* at pp. 733–734.) The appellate court reversed, concluding that there was no substantial evidence to support the court's findings because the prosecution did not meet its burden on the issue of the defendant's sincerity. The record showed that the defendant had been attending AA meetings for two years, rather than six months as the trial court found, and the new law was passed after he began attending those meetings. The appellate court stated that the trial court's analysis "became disconnected from the evidence presented" and for that reason, remanded the case for further proceedings. (*Id.* at pp. 744–745, 748.) In contrast, the trial court's decision here to extend Fekadu's NGI commitment was not based solely on his criminal history or on an assessment of his sincerity. Rather, the court's findings are firmly supported by the considered opinions of the health care professionals that Fekadu poses a current substantial danger of harm to others based on his mental disorder, and by Fekadu's trial testimony.

For these reasons, we conclude that there is substantial evidence to support the court's findings that Fekadu poses a substantial danger of harm to others and that he would have difficulty controlling his dangerous behaviors.

## DISPOSITION

The order extending Fekadu's commitment to October 3, 2022, is affirmed.

AARON, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.