Filed 9/26/23  P. v. Garcia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>YADIRA GARCIA,<br><br>    Defendant and Appellant. | F084962<br><br>(Super. Ct. No. MCR032569)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from an order of the Superior Court of Madera County.  James E. Oakley, Judge.

Conness A. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Detjen, J. and Smith, J.

Defendant Yadira Garcia was found not guilty by reason of insanity (NGI) of battery by a prisoner on a nonprisoner and committed to the State Department of State Hospitals (DSH).  Her commitment was recently extended to July 8, 2024.  On appeal, defendant contends (1) insufficient evidence supported the trial court's conclusion that her mental illness caused her serious difficulty controlling her dangerous behavior and (2) assuming the extension of commitment order must be reversed, retrial is barred under double jeopardy principles.  The People disagree on both accounts.  We affirm.

## PROCEDURAL SUMMARY

On March 10, 2009, defendant was committed to DSH after having been found NGI of battery of a nonconfined person while she was incarcerated (Pen Code, § 4501.5).[1]  On March 29, 2012, defendant was released from custody to the Central California Conditional Release Program (CONREP).  Her CONREP was extended three times, for one year each time.

On October 27, 2015, she was admitted to DSH-Patton, after having been found to have violated the CONREP terms and conditions.  Her commitment to DSH-Patton was extended three times, for two years each time.

On January 6, 2022, the Madera County District Attorney filed a petition pursuant to subdivision (b) of section 1026.5 to extend defendant's civil commitment for two years for a fourth time, alleging that by reason of her mental disease, defendant presented a substantial danger of physical harm to others.  The petition was supported by an affidavit by the acting medical director of DSH-Patton and the report of a senior psychologist at DSH-Patton.

On September 1, 2022, the trial court found beyond a reasonable doubt that defendant suffered from a mental disease that caused her to pose a substantial danger of

---

[1]     All further statutory references are to the Penal Code.

physical harm to others and had serious difficulty in controlling her dangerous behavior. It therefore extended defendant's commitment for two years, until July 8, 2024.

On September 19, 2022, defendant filed a notice of appeal.

## FACTUAL SUMMARY[2]

**Jason Connors**

On June 24, 2022, Jason Connors worked at DSH-Patton. At approximately 2:30 p.m. on that date, a decision was made to move defendant from her dorm room that she shared with other patients to protect one of the roommate patients. Approximately an hour later, Connors walked past defendant's dorm room as she and her roommates were being moved and heard a commotion. Connors took the roommate that hospital staff were attempting to protect aside to confirm that she was okay. As defendant passed Connors and the other patient, defendant "performed a fake lunge … trying to make her flinch." Connors told defendant to continue to her new room and defendant did so. Soon after, defendant appeared visibly angry as she walked back to her old room and pointed her finger at the protected patient's face. While defendant and the protected patient were in their separate rooms, Connors heard defendant say, " 'This is bulls**t' " with respect to moving rooms. Defendant did not physically attack the protected patient.

**Carolina Valdez**

On July 11, 2022, at approximately 9:30 a.m., Carolina Valdez was conducting an aerobics group class at DSH-Patton in her role as a rehabilitation therapist. At approximately 9:55 a.m., defendant entered the room, walked up to one of the patients in the group, and punched her three times on the head with a closed fist. Defendant also called the patient a " 'b***h' " in Spanish. Defendant broke contact and walked away without instructions to do so.

---

[2] We omit any summary of the underlying offense that led to her commitment as it is not relevant to the issue on appeal.

3.

**Dr. Errinn Bixby**

Dr. Errinn Bixby was a clinical psychologist at DSH-Patton and was part of defendant's treatment team. She provided individual therapy for defendant. Dr. Bixby testified that she "would like to see [defendant exercise] more control of impulses and … [have] a better understanding of her coping skills and mood symptoms" before she was released to the community without supervision. Dr. Bixby based that opinion on defendant's July 11, 2022 attack of the patient at the aerobics group class. Dr. Bixby had discussed the incident with defendant who told her "she felt that the [patient] was being disloyal, and that was what caused the altercation." Dr. Bixby opined that defendant developing impulse control was important to "prevent any future violence."

Dr. Bixby further noted that she would like to see defendant "change[] her thought patterns towards other people" in order to develop "good relationships" and avoid triggers for future violence. Defendant needed to be able "to handle slights or feeling like someone is being disrespectful or disloyal."

Dr. Bixby testified that defendant had the ability to control her impulses if she chose to do so. Dr. Bixby "believe[d]" that defendant also had the ability to change her thought patterns if she chose to do so.

**Gabriel Mejia**

Gabriel Mejia was defendant's assigned clinical social worker at DSH-Patton. He opined that before she was released unsupervised to the community she needed "to develop better mood management," be "able to tolerate discrepancies amongst other [patients], develop the ability to handle disagreements between herself and other people, [and] accept[] feedback from other people in the unit, staff, and [patients]."

Defendant had some insight into her criminogenic factors: she understood "that a large majority of her antisocial behaviors are the result of her drug use …, which then triggers psychosis, which then triggers antisocial … [and] criminogenic acts." There were "moments within" the past year where defendant had attended groups, had been

4.

open to feedback from staff, had been open to medication changes as needed, and had been forthcoming with her anxieties and potential triggers. However, that behavior was not consistent; other times, she refused to attend groups. Mejia also relayed that defendant had attacked a patient (presumably the July 11, 2022 attack) and had a history of threatening hospital staff "when things d[id not] go her way."

Mejia opined that defendant had the ability to change her behavior, but it would require insight and consistency. Mejia had mixed feelings about whether defendant could have been able to change her thought patterns and mindset because she had a long history of substance abuse and continued her drug-seeking behaviors while at DSH-Patton. If that variable could be negated, Mejia believed defendant could change her thought patterns and mindset.

**Dr. Waheed Saeed**

Dr. Waheed Saeed had been defendant's treating psychiatrist for approximately one year. Defendant was diagnosed with schizoaffective disorder, posttraumatic disorder, substance abuse disorder, and antisocial personality disorder. Dr. Saeed modified her medication in July 2022, after the July 11, 2022 attack. The medication change was designed to help defendant "have better self-control[] and to help her with anger outbursts." Defendant was also prescribed as-needed anxiety medication. In his last conversation with defendant, roughly one month prior, she indicated that she was taking her as-needed medication and had been "doing well with her medication" in general. Defendant had been compliant with her medication in the last year.

Dr. Saeed would normally recommend supervised release into the community only if a patient had been stable on their medication for a minimum of six months and had been "able to utilize coping mechanisms … instead of relying on as-needed medication." He explained, even on supervised release, use of as-needed medication in the community had a risk of overdose. Because defendant's symptoms and medication had fluctuated in the past year, Dr. Saeed could not determine whether defendant had developed the coping

mechanisms required to be stable on supervised release.  Based on defendant's medication usage at the time, Dr. Saeed did not recommend supervised release to the community.  He further commented that, in exceptional situations, some patients were released on supervised release while taking as-needed medication, but it was "rare" and "not a common practice …."

### Dr. Jason Rowden

Dr. Jason Rowden was a "senior psychologist specialist forensic evaluator" at DSH-Patton.  He attempted to interview defendant on December 2, 2021, and June 17, 2022, but defendant refused to meet with him.  On December 2, 2021, Dr. Rowden went to defendant's room at DSH-Patton and found defendant in bed.  He explained that he was there to evaluate her to update the court on her progress and treatment.  She refused the interview and continued to lay in bed.  On June 17, 2022, defendant again refused to meet with Dr. Rowden.  Dr. Rowden opined that defendant's refusal to meet with him was "seemingly due to [her] depression and her lack of motivation," as also documented elsewhere in her treatment records.  Dr. Rowden's interactions with defendant were limited to those two attempts to interview her.

Based on his interactions with defendant and after hearing the testimony given at trial, Dr. Rowden opined that defendant did have a severe mental disorder.  He agreed with Dr. Saeed's diagnoses.  He further opined that as a result of her mental disorder, she posed a substantial danger of physical harm to others.  He noted that defendant had engaged in violent behavior recently, had difficulty consistently engaging in treatment, had multiple psychiatric medication changes over the previous year, and still relied on as-needed medication to cope with anxiety and symptoms of paranoia.  He explained that when such behavior is seen inside a controlled setting like DSH-Patton, a patient continues to pose a substantial danger of physical harm in a less restrictive environment.  Further, Dr. Rowden opined that due to her mental disorder, defendant had serious difficulty controlling her dangerous behavior, evidenced by her violence at the hospital

(two incidents of which Dr. Rowden was aware in the past year) and threats made in the recent past.

Dr. Rowden testified that while defendant is "capable of controlling her behavior," she had not recently "shown [the] capacity to do so." Similarly, while "[w]e all have the ability to control our thought pattern, … [defendant] ha[d] evidenced specific behavior that show[ed] that she ha[d] extreme difficulty doing that, even in a structured setting such as Patton State Hospital."

### DISCUSSION

Defendant contends the trial court erred in extending her commitment because the "witnesses … opined that [defendant] could, in fact, control her dangerous behavior." The People disagree with defendant's reading of the evidence, as do we.

#### A.  Relevant Legal Principles

When a defendant is found NGI of a felony, and confined to the DSH, the commitment may be extended for two-year periods if due to mental illness and the defendant continues to pose a substantial danger of physical harm to others.  (§ 1026.5, subd. (b)(1); *People v. McKee* (2010) 47 Cal.4th 1172, 1207; *People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1369–1370.)  To establish the substantial danger of physical harm element, the prosecution must prove beyond a reasonable doubt that the person has, " 'at the very least, serious difficulty controlling his [or her] potentially dangerous behavior.' " (*People v. Redus* (2020) 54 Cal.App.5th 998, 1010; accord, *People v. Williams* (2015) 242 Cal.App.4th 861, 872.)

In order to find a defendant continues to be dangerous, the evidence must demonstrate, beyond a reasonable doubt, that there is a serious impairment of volitional control of the person's behavior.  (*People v. Williams* (2003) 31 Cal.4th 757, 773; *People v. Kendrid*, *supra*, 205 Cal.App.4th at p. 1370.)  Whether a person, by reason of mental illness, poses a substantial risk of physical harm to others can be established by expert opinion testimony.  The testimony of one expert, based on relevant facts in the record,

that the defendant meets the test of dangerousness is sufficient to support a trial court's finding. (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879; *People Cheatham* (2022) 82 Cal.App.5th 782, 790–791.)

## B.  Standard of Review

When we review the decision of a trial court granting the prosecution's petition to extend a defendant's commitment under section 1026.5, we apply the familiar substantial evidence standard of review.  Under that standard, we review the entire record, drawing all reasonable inferences in favor of the trial court's decision.  We do not make credibility decisions, nor do we weigh the evidence.  Rather, we determine whether there is sufficient substantial evidence in the record, from which a reasonable trial court could find the defendant remained a danger to others due to their mental illness, beyond a reasonable doubt.  (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165; *People v. Bowers*, *supra*, 145 Cal.App.4th at p. 879.)  "A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment."  (*People v. Williams*, *supra*, 242 Cal.App.4th at p. 872.)  Reversal is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the verdict.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## C.  Analysis

As a preliminary matter, the parties agree that substantial evidence supported the conclusion that defendant had a mental disorder.  Dr. Saeed testified that defendant was diagnosed with schizoaffective disorder, posttraumatic disorder, substance abuse disorder, and antisocial personality disorder.  Any one of those diagnoses is a mental disorder.

Defendant also does not appear to contest the trial court's finding that she presented a substantial danger of physical harm to others.[3] Her sole contention regarding sufficiency of the evidence is that the evidence did not support the trial court's finding that she had serious difficulty controlling her behavior related to her mental disorder. She contends that, at most, the evidence supported the conclusion that she "was able to control her behavior, but chose not to."

Defendant directs us to portions of the record that she contends demonstrate that she was capable of controlling her behavior and that her acts of violence were unrelated to her mental disorder. For instance, defendant contends that Connors's testimony regarding defendant performing a fake lunge toward a patient and pointing at a patient lacked any comment on whether defendant's behavior was a result of her mental illness impacting her ability to control her behavior. She also contends that because Valdez believed the incident where defendant punched another patient three times was a "deliberate attack," it could not have been a result of defendant's serious difficulty controlling her behavior. Defendant's contentions fail to acknowledge Dr. Bixby's opinion that defendant needed to develop more impulse control before she could safely be released, Mejia's opinion that defendant required insight into her condition and consistency to be able to control her behavior, Dr. Saeed's testimony that defendant's medication was modified after her attack on a patient to help her "have better self-control[] and to help her with anger outbursts," and Dr. Rowden's testimony that defendant's attack on a patient and threats to staff indicated that she had difficulty controlling her behavior as a result of her mental illness. All of those statements

---

[3]     To wit, defendant identifies the two violent incidents in the preceding year to which Connors and Valdez testified. She then contends that those violent incidents were insufficient to prove that defendant presented a substantial danger of physical harm to others if they were unrelated to her mental disorder causing her to have difficulty controlling her dangerous behavior.

9.

provided evidence supporting the trial court's conclusion that defendant's inability to control her violent behavior was caused by her mental illness.

Defendant further points to portions of the experts' opinions that she contends demonstrate that they believed she could control her dangerous behavior. After testifying that defendant needed to develop impulse control, Dr. Bixby was asked if defendant "ha[d] the ability to control her impulses if she chose to do so," and she answered, "Yes." Likewise, Mejia was asked if defendant had the "capacity" to change her behavior and he responded, "Yes. I do think she has the ability to change [her] behaviors, but that [requires] insight and consistency." Dr. Rowden was also asked if defendant had the ability to control her behavior and he answered, "I think she is capable of controlling her behavior, but the evidence is that she hasn't, recently, shown that capacity to do so." As to controlling her "thought patterns," Dr. Rowden commented, "We all have the ability to control our thought pattern, but [defendant] has evidenced specific behavior that shows that she has extreme difficulty doing that, even in a structured setting such as Patton State Hospital." Defendant contends that those statements all indicate that there was not substantial evidence supporting the trial court's finding that she had significant difficulty controlling her dangerous behavior. We disagree. While considering those statements in isolation might lead a trier of fact to conclude that defendant could control her dangerous behavior, considering the record as a whole makes clear that Dr. Bixby, Mejia, Dr. Saeed, and Dr. Rowden all opined that defendant's recent violent behavior was an indication that she had serious difficulty controlling her dangerous behavior as a result of her mental illness. That defendant may have been, in the abstract, capable of change and may at some point in the future or past have or have had the ability to control her dangerous behavior does not negate the substantial evidence supporting the trial court's conclusion that defendant had significant difficulty controlling her dangerous behavior.

In short, substantial evidence supported the fact of defendant's recent violent behavior and the experts' conclusions that the violent incidents were a reflection of

10.

defendant's significant difficulty controlling her dangerous behavior due to her mental illness.[4]

## DISPOSITION

The order is affirmed.

---

[4] Because we conclude that substantial evidence supported the trial court's order extending defendant's commitment, we do not consider whether any retrial of the matter would have been barred on double jeopardy grounds.